By the Court.
 

 Bayard,
 
 Chief Justice.
 

 In this case the following points have] been made, which we shall notice in the order in which they arel stated.
 
 First,
 
 it is contended, that by the charter of the corpora-l tion, the city council are constituted the sole judges of the election returns and qualifications of all the officers of the corporation, ancl that this court has no jurisdiction over the subject.
 
 Secondly,
 
 thai by the eighth section of the seventh article of the constitution of thJ State, it is expressly declared that no ordained clergyman or preachl er of the gospel of any denomination shall be capable of hoMin*
 
 any civil office in this State,
 
 while he continues in the exercise of till pastoral or clerical functions; and that Mr. Hagany being an oil dained preacher of the gospel, in the exercise of his clerical fun cl tions, is incapable of holding the office of city treasurer.
 
 ThirdlM
 
 that in the absence of any by-law regulating the election, (and nor|
 
 *299
 
 has been shown,) the common law rule prevails, which requires a majority of the votes cast to make an election, and that Mr. Hagany not having received such majority, is not duly elected.
 

 As to the first point, the jurisdiction of this court, it is a perfectly well settled principle both in this country and in England, that civil corporations, whether public or private, are subject to the general law of the land, and amenable to the judicial tribunals for the proper exercise of their powers. (4
 
 Wheat. Rep.
 
 681,
 
 Dartmouth College
 
 vs.
 
 Woodward;
 
 2
 
 Kents Com.
 
 304; 2
 
 Kyd on Corp.
 
 174;
 
 3 Blac Com.
 
 42; 17
 
 Com. Law Rep. 325, Rex
 
 vs.
 
 Mayor of London.)
 
 In England the Court of King’s Bench superintends all civil corporations, and in this State, the Superior Court is invested with all the powers of the Court of King’s Bench, in all manner of pleas, actions, suits and causes, and in the general administration of justice to .all persons. There cannot, therefore, be a doubt as to the authority of this court ¡to superintend this corporation, as well as other civil corporations in the State: to correct abuses, and' to compel them to the due and proper exercise of their powers.
 

 The question presented in the second point is, whether the office of [treasurer in this corporation comes within the true meaning and im[port of the terms
 
 “civil office in the State,"
 
 as used in the constitution.” The word
 
 State
 
 has two meanings, and is used in both of them, in different parts of that instrument. In one sense it signifies the
 
 territory
 
 inhabited by the people; in the other it means the
 
 body molitic
 
 inhabiting the territory, so that the words
 
 “civil office in the
 
 Bictie” may mean either civil office within the territory, or civil »ffice in the frame of government, or political organization which it ivas the business of the convention to establish. As the purpose of K. constitution is to establish the principles of government for the community as a body politic, without any particular reference to the territory which they inhabit, the primary and leading sense in which ■ie term
 
 State
 
 is used, is that4 of the body politic. The general sublet matter of the instrument, are the political principles of the social Hrganization. The provision referred to, has evident relation to, and ■ in accordance with the first section of the first article of the con-■itution, which asserts and secures the most perfect religious liberty, Kd was meant to establish the great political principle of the sepa-Rtion of church and State. The object of the labors of the conven-Rn, was the construction of a frame of government for the commu;y, and the announcement of tho principles on which it was con
 
 *300
 
 structed. The immediate purpose of the provision is accomplished by confining the import of the terms used to the political system then framed. The other construction would be inconveniently broad, and apart from the manifest purpose of the provision; for it would exclude clergymen from being officers, even of private corporations, such as banks, manufacturing companies, insurance companies, &c. I am, therefore, clearly of opinion that the terms used in the constitution have reference to State officers, and not to corporation officers, and that Mr. Hagany was eligible to the office of city treasurer.
 

 But the question arises whether he has been duly elected; which is the third and last point made in the case. The whole number of votes cast was nine hundred and eighty six, of which he received four hundi-ed and ninety, which is less than a majority. Could
 
 he
 
 be elected by a number less than a majority? In the absence of any j provision in the charter, and of any by-law regulating the election, 'the matter is subject to the rules of the common law. The common I law rule is perfectly well settled, that the majority, alone can bind the I community. (1
 
 Kyd on Cory.
 
 308;
 
 Ang.
 
 &
 
 Ames on Corp
 
 280; 2|
 
 Kent’s Com.
 
 293; 7
 
 Serg Ramie
 
 517.) It has been stated in argument, that the practice has been heretofore in corporate elec-| tions in the city of Wilmington, to consider the person having the! highest number of votes, although not a majority of the whole,! as duly elected, and it is said that there must have been a by-law to that effect, although it cannot now be found. However this maj be, it is a subject of which the court can have no official know-1 ledge. Nor can they presume a by-law, although upon an issue ol fact depending before them, they might instruct the jury to find one! upon evidence of
 
 long'
 
 and ancient usage.
 
 (Lee’s cases, tempori Hardwick
 
 317; 2
 
 Ves., sen.
 
 330.) The matter now comes up upo¡| a rule to show cause why a mandamus should not issue; and thi parties have agreed upon a statement of the case for the opinion court. In that statement no mention is made of any such by-lavl or of any such usage, nor has any such by-law been produced, anf the case must, therefore, be decided upon the the rule of the com mol law. It has been contended that the twenty-fifth section of the acj - of assembly entitled “An act regulating the
 
 general
 
 election,” whicj provides “that in all elections in this State, except where it is or sha be otherwise expressly provided, plurality or the highest number votes, do and shall make a choice,” has modified the common lal in that particular in all popular elections. But it is perfectly cíes
 
 *301
 
 that the act in question has reference to State elections; and that the provision in question must be understood as applicable to them alone. The subject matter of the law was not a revision and change of the principles of the common law generally, but the establishment of a system for conducting the public elections of the State, and the principles by which they should be regulated. It follows, therefore, that as this was a corporation election, in which by the rules of the common law, it requires a majority to make a choice, and Mr. Hagany did not receive such majority, he was not duly elected, and the rule must be discharged.
 

 Harrington-,
 
 Justice:
 

 The borough of Wilmington was incorporated by letters patent in November, 1739. It received a charter from the general assembly in 1772, by the 25th section of which the freeholders and electors within the borough, were authorized at every annual election, to choose a
 
 treasurer
 
 for the borough. The only qualification for this officer required by that charter was, that he should bé “a substantial inhabitant of the borough.” Before the adoption of any constitution in this State, the office of treasurer of the borough of Wilmington was established. It existed as a part of the corporation; asan office necessary for the.-government of the town, and belonging to it, not merely as an incident of its charter, but by express grant. It was subject to no such qualification as is now contended for; and, if such restriction is to bé imposed upon it, it must be shown to have been done by positive constitutional enactment. There is another reason why this disqualification should be shown affirmatively. It not only takes away a former vested right of the corporation to elect
 
 any
 
 “substantial inhabitant” to the office of trea-l surer, but it is an individual disqualification; a restriction of the right which the relator in this case had, in common with every other inhabitant of the borough, to be eligible to that office.
 

 The charter by which the corporation of Wilmington was originally established was recognized and confirmed by the 24th article of Jthe constitution of 1776; by the 9th section of the 8th article of the constitution of 1792, and by the 8th section of the 7th article of the ¡amended constitution of 1831. “The rights, privileges,, immunities ¡and estafes of religious societies and corporate bodies shall remain |as if the constitution of this State had not been altered.” But the constitution of 1831, and also that of 1792, contain a provision that ‘no ordained clergyman or ordained preacher of the gospel of any
 
 *302
 
 denomination, shall be capable of holding
 
 any civil office in this
 
 Stale, or of being a member of either branch of the Legislature, while he continues in the exercise of the pastoral or clerical functions.”
 

 I come then to the question whether this clause of the constitution has reference to civil offices under the State government merely, or whether it embraces officers of a
 
 corporation,
 
 such as the treasurer of the borough of Wilmington.
 

 In construing organic laws special regard should doubtless be had to the principle intended to be announced, rather than to the words used; but we must not do violence to the words in search of intention; nor have we the right to extend a principle beyond its manifest application. This is particularly so in reference to a restrictive or disqualifying principle, and when it is to take away rights previously enjoyed, whether natural or acquired.
 

 The principle which this clause of the constitution is supposed to announce is, that ordained clergymen shall not be employed in administering the government. It doubtless grew out of a wrise determination to keep the affairs of the church separate from affairs of State, and by excluding from public office ministers of the gospel, to exclude also any improper influence from that source on public affairs. Is this principle fully recognized in excluding clergymen from all offices connected with the government properly speaking, or does it require to be extended to offices held under public corporations, and not held under or composing any part of 'the State government? The business of the convention was to establish a State government and to provide the mode of its administration. In speaking of
 
 offices
 
 such offices were undoubtedly meant as were designed for this purpose, either directly or indirectly. And the constitution f is very particular in its details in reference to officers and the model of their appointment, specifying election officers, officers relating to I taxes, to the poor and to highways, constables and hundred officers.I Even attornies at law- seem to have been regarded as officers, being! a part of the judicial branch of the government, and concerned ini carrying out the system. For all these have their parts to perform;! and without the agency of any, the most unimportant of them, the! system would be imperfect. But the constitution no where descends! to notice a corporation officer. Such an office forms no part of thel system of government; it is perfectly immaterial for all the purposes! of State government, whether the city of Wilmington has a treasurer or no treasurer; and, as the existence of such an officer did not en-j
 
 *303
 
 ter into the system of government which the convention was forming, it cannot be supposed that the qualifications or disqualifications which they sought to apply to
 
 their officers,
 
 were designed by them to be extended and applied to such corporate officer.
 

 But if this office of city treasurer be an office within the meaning of the constitution, the whole affair is wrong, and the people of Wilmington have no right to choose the person who shall fill that office. If this be a “civil office in this State;” such an office as is embraced within the constitution; it is an office “under this State,” and the appointment to it is, by the same constitution, vested in the Governor. “Art. 3. Sec. 8. The Governor shall appoint all officers whose offices are established by this constitution, or shall be established by law, and whose appointments are not
 
 herein
 
 otherwise provided for.” This I is an office established bylaw, and the appointment toit is not provided I for in the constitution otherwise than by the general appointing power I of the Governor; if therefore it be a constitutional office, it must be I filled by the Governor’s appointment. I cannot bring my mind to [appreciate the distinction between a civil office in the State, under [the constitution, and a civil office under the State; a distinction which [the gentleman opposing the mandamus in this case mentioned, as [striking some minds with greater force than it did his own. The [distinction is without a difference. It implies that there can be an [office under the constitution which is not an office under the State, [which reduces it to an absurdity. The term office in the State can-mot refer to the territorial limits of the State but to its government; tin which respect the State means the constitution or form of government; and an office in the State or within the government, must be in office under the State or government. If then this office be a ‘civil office in the State,” under the constitution, it is not an elective mffice, and the appointment to it belongs to the Governor; if it be not civil office under the constitution, but a mere office of a corpora-[ion, the appointmont to it is regulated by the charter and laws of [he corporation, and the constitutional disqualification of clergymen |o hold office under the constitution does not apply to it.
 

 Again: if this be an office under the constitution, the officer is Ha-lle to impeachment before the legislature of the State, for any mis-. lemeanor in office. The application of this fact seems to me to be [gain conclusive on this question. “Art. 5, Sec 2. “The Governor |nd all other civil officers under this State, shall be liable to impeachment for treason, bribery or any high crime or misdemeanor in
 
 *304
 
 office.” That is, if the treasurer of the city of Wilmington shall embezzle the funds belonging to the people of that city, and not to the people of the State at large; or shall violate his duties as prescribed by the ordinances of the city council, and not by the laws of the State; he shall be responsible to the people of the State as for a violation of the laws of the State, and may be solemnly impeached before their legislature in like manner with the Governor or any other State officer. And the consequences of conviction equally show that this person is not an officer under the constitution. The first consequence is
 
 removal from (fice.
 
 Now what right have the people of the State of Delaware in their aggregate capacity to remove an officer of the corporation of Wilmington, for a supposed violation of their city ordinances'? He is their servant; elected by them; governed by their orders as expressed in the city ordinances; trusted by them with their own property; and responsible to them, and to them alone. Another consequence of such conviction would be a disqualification
 
 “to
 
 hold any office of honor, trust or profit under this I State,” (implying the previous expulsion from
 
 such
 
 an office.) “And j the party convicted shall be subject to indictment, trial, judgment and punishment, according to law!” But the city treasurer is not indictable in our courts; for he can be guilty, as such, of no violation! of the laws of the State; and though he might be indicted in the! mayor’s court, and be punished there, it would present the strange] result of a corporation officer violating corporation laws, impeached] as a State officer for high State crimes, and then remitted to the! corporation for punishment, the State being unable to punish an officer which it had the right to impeach. This anomalous working ofj the system shows that it cannot be true that the treasurer of Wil-| mington is any part of it. The city treasurer does not then hold civil office in this State,” under-the constitution. The case citec from 4
 
 Dallas,
 
 more fully reported in
 
 3 Yeates,
 
 is in point and on the same principle. Mr. Dallas held an
 
 office
 
 under the United Stated and he also held the office of
 
 recorder
 
 of the city of Philadelphia] with a salary annexed by law. The offices were supposed to be ini compatible, as the constitution of Pennsylvania declares that no peri son holding any office of trust or profit under the U. States, shali at the same time hold the office of
 
 judge,
 
 secretary, &c., “or
 
 ani office in this -State”
 
 to which a salary is annexed, &c. It was arguj ed on the other hand, that Mr. Dallas was a
 
 judge,
 
 the head of thf mayor’s court, and that he was not merely an
 
 officer of the corpora
 
 
 *305
 

 tion
 
 of Philadelphia; on the other that the constitution referred only to
 
 State officers,
 
 and that the i’ecorder of the city of Philadelphia was not a State officer, but was only an officer of the corporation, and therefore no judge within the meaning of the constitution; and the Supreme Court of Pennsylvania was
 
 unanimously
 
 of this opinion.» The case is precisely to the point that, under a constitution where the words are in this respect the same with ours, an officer of the corporation of Philadelphia was not within the constitutional meaning of the term an
 
 officer in the
 
 State. I conclude, then, that the fact presented in the case stated that Mr. Hagany, the relator, is an ordained preacher of the gospel, in the exercise of his clerical functions, is no disqualification to his holding the office of treasurer of the city of Wilmington.
 

 I consider the second point also in favor of the relator. The plurality principle has been universally applied to these and all other elections in Delaware. It has been invariably adopted as most in consonance with our institutions, in all cases where the law of the election is silent in this respect; and in most cases it will be found that the law is silent; the principle being so universal as not to claim particular provision. ¡I do not find that the principle is directly asserted even in the constitution of 1776 or of 1792. But I also regard the announcement of the principle in the act of 1825, together with the subsequent pas&age [of a law regulating these city elections (and under which this elec-ción took place,) as expressly applying the plurality principle to the ■ pity charter elections. In section 25 of the act of 1825, it is
 
 “enacted and delated,
 
 that in all elections in this State, except’ where it is br shall be otherwise expressly provided,
 
 plurality
 
 or the highest ■lumber of votes do and shall make a choice. It is true, that this principle is announced in the general election law, but it was manifestly designed to lay down a
 
 general principle
 
 applicable to all cases Ivhere the particular law of the election did not otherwise expressly provide, applicable to corporations both public and private, or to any ftther body of men holding an election under any law of this State, imless the law of the election specifies a different rule.
 
 Subsequently
 
 k>
 
 this
 
 the corporation of Wilmington have accepted a law regulating Bieir election, which law does not provide any other rule. It is, Bierefore, to be presumed that the legislature in passing, and the cor-■oration in accepting, this law, designed that' the general principle Beplicable to all elections should govern. And this presumption is ■lengthened by what is alledged to have been the
 
 uniform usage
 
 on ■is subject; which lord Mansfield says, in
 
 Rex
 
 vs.
 
 Varlo
 
 (1
 
 Cowp.
 
 
 *306
 
 250) is of great force where the words of the charter are doubtful. The amended charter provides only that the treasurer shall be elected by ballot, annually by the citizens, on the first Tuesday of October. This act was passed in January, 1832. J consider
 
 it as
 
 adopting the general rule previously announced by the legislature, that a plurality of votes should make a choice unless otherwise specially provided; a rule much more convenient in practice, and which will prevent frequent failures to elect. •
 

 The third cause shown against granting the mandamus in this case is, that by the law of this corporation the members of the city council are the judges of the election, returns, and qualifications of all officers of the corporation; and that this coürt has not jurisdiction by appeal or otherwise to review their decision. This , brings in. question the right of the Superior Court to issue a man- ¡ damus to the corporation of Wilmington, commanding its officers to judge according to law. It necessarily brings up the broad question of the power of this court to compel corporations by man-1 damus to do acts which by law they ought to do; for if it is an I answer in one case that they are the judges of the law, it is so ini every case, and the remedy by mandamus does not exist. Fori the corporation or some branch of it is necessarily the judge in thel first instance, not only of the question of the qualification of its offi-l cers, but of every question brought before it; yet it does not follow! that where the facts are admitted or proved, this court has not the power to require it to judge according to law. . It is no discretionar} power, if it were the writ of mandamus could reach no further thar to compel them to act according to their discretion; but this is matter of legal right, over which neither the city council nor thiJ court have any discretion; and the question is whether this courl has power by mandamus to compel the acknowledgment of that righl on the part of the city council.
 

 “The writ of mandamus is a prerogative writ issuing (in England! from the Court of
 
 King's Bench,
 
 directed to persons, corporations, o j inferior courts requiring them to do a specific act, as being the dutf of their office, character or situation, agreeably to right and justice! This_ writ affords a proper remedy in cases where the party has nc any other means of compelling a specific performance. The onl| proper ground of the writ is a defect of justice.” (2
 
 Selwyn’s N.
 
 261.) “The power of issuing writs of mandamus is one of the high cst and most important branches of the jurisdiction of the court
 
 *307
 

 King’s Dench.” (Awdley
 
 vs.
 
 Joyce, Poph.
 
 176; 1
 
 Chitty’s Gen. Pr.
 
 789.) “In order to maintain the peace and good government of corporations, and to secure their adherence to the purposes of their institution, the law has appointed a tribunal to inspect the conduct of their internal affairs, and to whose decision all disputes arising within them may be referred. This tribunal in the case of eleemosynary and ecclesiastical corporations, is in general, that of a private visitor; of all other corporations, the Court of
 
 King’s Bench.”
 
 “The latter exercises is visitatorial jurisdiction in two different ways; by writ of
 
 mandamus
 
 and information in the nature of
 
 quo icarranto.”
 
 (2
 
 Kyd on Corp.
 
 174.)
 

 The jurisdiction of issuing this ■ writ is exclusively in the King’s Bench, as the court having a supervisory power over all inferior courts and corporations; the principle on ’which it issues is the
 
 defect
 
 of remedy; the impossibility of enforcing a legal right by any other means, or any sufficient means, than a resort to this power existing in the Court of King’s Bench to supervise the conduct of all public corporations, and compel them-to act according to law. Under this general power the court of King’s Bench in England has repeatedly and always exercised the right to -issbe the writ of [mandamus to public corporations in cases similar to the present; land as this court has the same powers of the Court of King’s [Bench, which cannot be taken away but by express exclusive words, [we have no doubt of our jurisdiction in the case before the court. *17
 
 Com. Law Rep.
 
 325; 9
 
 Barn.
 
 &
 
 Cres., Rex
 
 vs.
 
 Mayor of London.)
 
 By the act for the better regulation of the Supreme Court within this government, the judges of that court, and now of the Superior Court, I'shall minister justice to all persons, and exercise the jurisdictions Ind powers hereby granted them, concerning all and singular the «remises according to law and equity, as fully and amply to all in-lents and purposes whatsoever, as the justices of the King’s Bench Ind Common Pleas at Westminster, or the chancellor of England may or can do.
 
 (Digest
 
 104.)
 

 Laytos,
 
 Justice:
 

 In the argument of this cause the jurisdiction If this court over the matter has been denied. Now if the court lave no jurisdiction in the premises, it would be manifestly improper B decide it: indeed, it would be a usurpation of judicial authority Bjurious to the rights of corporations, and nowhere warranted by .o constitution.
 

 
 *308
 
 Before I proceed then, to discuss the other questions involved in the case stated, and upon which the opinion of this court is invoked, it is necessary, in the first place, to ascertain whether this court has legal jurisdiction to hear and determine the questions submitted for consideration in the case stated. The constitution of this State vests in the Superior Court “jurisdiction of all causes of a civil nature, real, personal and mixed, at common law, and all other the jurisdiction and powers vested by the laws of this State in the Supreme Court, or Court of Common Pleas.”
 
 (Amend. Const. Art.
 
 6,
 
 sec.
 
 3.) The third section of the act of the general assembly of this State, entitled “An act for the better regulation of the Supreme Court within this government,” passed April 28, 1760, vests in the Supreme Court “full power and authority to examine, correct and punish, the con-tempts, omissions, neglects, favors, corruptions and defaults, of all or any of the justices of the peace, sheriffs, coroners, clerks, and other officers within this government; and also to award process for levying all such fines, forfeitures and amerciaments, as shall be taxed, I imposed or set in the said Supreme Court, or estreated there; and
 
 generally shall minister justice to all persons,
 
 and exercise the jurisdictions and powers hereby granted them, concerning all and singu-l lar the premises according to law and equity,
 
 as fully and amply
 
 to I all intents and purposes whatsoever,
 
 as the justices of the Kivg’sX Bench
 
 and Common Pleas at Westminster, or the chancellor of Eng-| land may or can do.” (1
 
 Del. Laws
 
 376;
 
 Digest
 
 104.)
 

 The Court of King’s Bench in England has power to issue thel writ of mandamus, and “figuratively, it has been treated as its
 
 principal flower.'”
 
 (8
 
 East
 
 219.) The writ of mandamus has been de-l fined to be “a prerogative writ, containing a command in the king’s name, and issuing from the Court of King’s Bench, directed to per-l sons,
 
 corporations
 
 or inferior courts of judicature within the king’; dominions, requiring them to do a certain specific act., as being thd duty of their office, character or situation, agreeably to right and justice.” (2
 
 Wheat. Selw. N. P.
 
 261.) And
 
 “a defect of justice,”
 
 ij regarded as the proper ground of the writ. A mandamus lies eithcl to restore a person wrongfully ousted, or to
 
 admit
 
 a person wrong fully refused.
 
 (Ibid
 
 262.)
 

 By an extension of the ancient writ of restitution, a remedy hs been provided for persons who have been duly elected to offices, a| though they never had possession. Hence a mandamus lies to
 
 ac mit
 
 as well as to restore a person to his office as a mayor, aldermaj
 
 *309
 
 town clerk, &c. (2
 
 Wheat. Selw.
 
 262;
 
 Com. Dig. tit. Mandamus
 
 A. 17
 
 Com. Law Ref.
 
 325.) This court, therefore, has jurisdiction to issue a mandamus to corporations, “for the purpose of compelling them to observe the ordinances of their constitution.”
 

 In the case presented to the court it is contended by the relator, John Hagany, that he has been duly elected treasurer of the city of Wilmington, and prays the exercise of the powers pf this court to command the city council to admit him to that office.
 

 On behalf of the city council it is alledged, 1. That John Hagany is an ordained preacher of the gospel, and as such, constitutionally incapable of holding any civil office in this State. 2. That John Hagany was not duly elected: that, according to law, it required
 
 a majority
 
 of the whole number of corporators voting to elect: that he received a
 
 plurality
 
 merely, and that a plurality cannot elect. 3. That the city council are legally constituted the sole judges of the election of their own officers; and that it is a political power, from which there lies no appeal to this court.
 

 , In answer to this last objection it is proper to reffiark, that although the 5th section of the act of incorporation declares that the city council “shall be the judges of the election returns and qualifications of their own members, and of all other officers of the corporation,” yet this power is vested in the city council, to act within the legitimate scope of their authority. It is not a question of mere discretion, independent of a right of review by the Superior Courts of law, for an
 
 unjust
 
 and
 
 illegal
 
 exercise of this power vested in the corporation by law. To illustrate this position: Suppose that in the exer-Icise of this discretion on the part of the city council they had con-Ifessedly and corruptly decided against the right of an individual, notoriously-elected by a large, overwhelming majority of nqt only the [corporators voting at the election, but of all the corporators within [the limits of the corporation; will it be contended for a moment, that [this court, in the exercise of this extraordinary power, cannot look Ibeyond the mere fact of decision by the city council into the justice fend legality of that decision! Could it have been the design of the legislature to vest in this corporation the power to do an act of gross Injustice, inconsistent with the rights of the corporators; indeed ut-|erly subversive of the great objects of the corporation, without subjecting their unjust and corrupt decision to the supervision of the ■Superior Court, in conformity to the principles of the common law, jmder and subject to which, the corporation accepted its charter?
 
 *310
 
 So gross a proposition need only be properly stated to be unhesitatingly repudiated. Indeed, such a pretence is set up in the face of •well settled principles, and of numerous adjudged cases. The writ of mandamus is “one of the modes in which the courts exercise common law jurisdiction over civil corporations, for the purpose of compelling them to observe the ordinances of their constitution, and to respect the rights of those entitled to participate in their privileges.”
 
 (Angell
 
 &
 
 Ames on Corp.
 
 426.) “The writ of mandamus is substantially a command in the name of the sovereign power directed to persons,
 
 corporations,
 
 or inferior courts of judicature within its jurisdiction, requiring them to do a certain and specific act,
 
 as being the legal duty
 
 of their office, character or situation.”
 
 {Id. lb.)
 

 W e come then to the second objection, and are led to inquire “Was John Hagany duly elected treasurer of the corporation?” To determine this question, we must advert to the law of corporations. Corporations are either public or private. As to private corporations, where the election' or choice is vested in a
 
 definite
 
 number of corporators, the law requires a majority 'of the whole number of cor-porators. But in public corporations, where the elective franchise is vested in an
 
 indefinite
 
 number, there a
 
 majority
 
 of the corporators actually voting, may elect: and such a majority is necessary to a I valid election.
 
 {Cases Temp. Hardic.
 
 316.) Has this general law of corporations been uiodified, or controlled by the general election law of this State?- I think not: for it is a principle of law, that general law does not affect corporations or corporate rights, unless! they are expressly mentioned in terms in the law. The election laws! refer to State elections and State officers. Corporate officers are! not State officers, otherwise, by express provision of the constitution! Mr. Hagany, as an ordained preacher of the gospel, would not bel eligible to office in this corporation.
 

 A question might have been presented as to how far the uniforml construction given to their charter by the corporation itself; howl far the custom', prevailing in the corporation under a by-law of the! corporation, would control the general provisions of law. (See
 
 Cases Temp. Hardw.
 
 316;
 
 The King
 
 vs.
 
 Tomlyn.)
 
 But this question of cus-J tom or construction, has not been presented as a part of the case stated; and we are driven to a decision of this case upon the general principles of law applicable to this question.
 

 It appears there were nine hundred and eighty-six votes cast al of which John Hagany ref the election held on the 13th of October,
 
 *311
 
 ceived but four hundred and ninety, being a
 
 plurality
 
 over other candidates, but a less number than a majority of all the corporators who voted at that election. 1 am of opinion, therefore, and concur with the chief justice, that John Hagany was
 
 not
 
 duly elected treasurer of the city of Wilmington.
 

 Wales,
 
 for the relator.
 

 J. A. Bayard,
 
 for the city council.
 

 In regard to'the remaining questions, I concur with the opinion and general reasoning of the court,
 
 first:
 
 that the office of treasurer of the corporation of the city of Wilmington, is not “a civil office” within the meaning of the constitution. On this point, I found my opinion upon the case of
 
 The Commonwealth of Pennsylvania
 
 vs.
 
 Alexander James Dallas,
 
 reported in (3
 
 Yeates
 
 300,) and upon the authorities referred to in that case:
 
 second:
 
 that by the terms of the original act of incorporation, “any
 
 substantial
 
 inhabitant of the town” could be elected to that office. In the year 1739, when the charter was first granted, there was no" exclusion of the clergy In this State, then a colony. The-constitution of this State secured to i corporations, &c., the enjoyment of- their franchises “as if the constitution of this State had not been altered.”
 
 (Art.
 
 8,
 
 Sec. 9 of the Constitution of
 
 1792.) The same provision was incorporated in the I amended constitution of 1831.
 

 I The construction contended for by the counsel for the relator operates as a personal disqualification, and is against natural right; and Iwould be in derogation of one of the franchises of the corporators, lall of which were expressly recognized and secured to them by the ■constitution. I am of opinion, therefore, that an ordained preacher |of the gospel is not excluded by the constitution from holding office Kn a corporation, which was in existence at the time of the adoption fcf the constitution of 1792, and in which corporation he had been Previously eligible.
 

 Mandamus refused.