CASE 3—AGREED CASE—SEPTEMBER 15.

# Norman, Auditor, v. Central Kentucky Lunatic Asylum.

### APPEAL FROM FRANKLIN CIRCUIT COURT.

1. APPROPRIATIONS FOR ASYLUMS—DUTY OF AUDITOR.—Under the statute which provides that the President of the Board of Commissioners of each lunatic asylum and its Superintendent shall, every three months, certify under oath to the Auditor the amount of any unexpended balance then in the hands of its Treasurer, arising from what the State pays *per capita* for each lunatic, over the then liabilities of the asylum, and that the Auditor, in drawing his warrant upon the State Treasury for the sum allowed by law to said asylum, shall deduct any unexpended balance that has been reported, the Auditor may deduct an unexpended balance of the existence of which he has trustworthy information, although the President of the Board and the Superintendent of the asylum may have failed to report it.

2. SAME.—When the Board of Commissioners has, in good faith, set apart the money on hand for a specific purpose, it is within the fair meaning of the statute no longer unexpended. Therefore the Auditor had no right in drawing his warrant upon the treasury in favor of appellee for its quarterly allowance to deduct money which the Board had set apart to pay for a necessary improvement then in course of construction, although liabilities sufficient to consume the money thus set apart had not yet been created.

3. POWERS OF ASYLUM COMMISSIONERS.—Aside from the implied powers necessarily arising from and coupled with the position, the Board of Commissioners has, by the statute, the express power to use and apply the means of the institution in any way best calculated in its judgment to further the purposes for which the institution was established, and may, therefore, without express legislative authority, expend the money of the institution in making necessary improvements.

WM. J. HENDRICK, ATTORNEY GENERAL.

1. The setting apart of the $19,500, mentioned in the resolution, was not in any sense an *expenditure* of the same, being, as the report shows, $3,500 more money than they had in the treasury.

2. The Auditor had the right to withhold the $16,000 whenever he was possessed of accurate and reliable information that that balance remained in the treasury of the asylum.

3. The Board had no right to authorize the expenditure for the purpose

Norman, Auditor, v. Central Kentucky Lunatic Asylum.

indicated in the resolution referred to. It could only be done by a legislative appropriation.

OHN C. RUSSELL, W. H. JULIAN FOR APPELLEE.

1. The Auditor .can estimate an "unexpended balance" only when reported by the President and Superintendent. (Gen. Stats., chap. 73, sec. 21, and amendments.)
2. Money which has been appropriated or set apart by the Commissioners for needed repairs is to be regarded as *expended.*
3. The proposed improvements may properly be termed "repairs of the institution." (21 Barb., 484; 49 Barb., 554.)
    But if not, the powers of the Commissioners in making improvements and in applying the property of the asylum are not restricted to "repairs."

CHIEF JUSTICE HOLT DELIVERED THE OPINION OF THE COURT.

The statute provides that the President of the Board of Commissioners of each lunatic asylum and its Superintendent shall every three months certify under oath to the Auditor the number of patients in the asylum, specifying the number of paupers, of those who pay in full and those who pay in part, and the amount; also the amount of any unexpended balance then in the hands of its Treasurer, arising from what the State pays *per capita* for each lunatic, over the then liabilities of the asylum, and the Auditor thereupon draws his warrant upon the State Treasury for the sum allowed by law, but must deduct from this quarterly allowance any unexpended balance that has been reported to him by the Superintendent and Chairman of the Board. All repairs to the institution must be paid for out of this allowance, and no liability can be created on behalf of the State in excess of it and what may be received from the pay-patients.

It is also provided that the Asylum Boards " shall have the general management and control of all the land, buildings, funds, books, papers and other effects and

property of their respective asylums, and shall cause them to be used and applied in the way best calculated in their judgment to promote the objects for which the institution was established."

July 3, 1890, the Superintendent of the appellee, the Central Kentucky Lunatic Asylum, reported to its Board that the boilers used in connection with the institution could not be safely used much longer, and that new ones, a new boiler house, etc., were necessary. The Board thereupon, by resolution, set apart for the purpose $19,500, and ordered it charged to the building account.

Preparations in the way of excavating and burning brick were made for the work. When the asylum applied for its allowance in January, 1891, the Auditor deducted from it the sum of $15,781.85 upon the ground that this amount remained in its treasury unexpended.

It claims that, although it had this money, yet as it had been appropriated to make the improvement spoken of, it was, within the spirit and meaning of the statute, not unexpended; and a mandamus is sought to compel the Auditor to draw his warrant upon the State Treasury for so much of the allowance as has been withheld on account of it. It was granted by the lower court.

The money, which the Auditor claims must be regarded as unexpended, had been saved from the previous allowances from the State, and when he made the deduction he did not know it had been appropriated by resolution for the repairs above mentioned or that the work had been commenced; nor had it been certified to him under oath by the Superintendent and Chairman of the Board that there was an unexpended balance on hand.

It is urged that he has no right to withhold any portion

of the quarterly allowance unless the fact of an unexpended balance in the asylum's treasury has been certified to him under oath by its Superintendent and the Chairman of its Board of Managers; that their joint sworn certificate is absolutely necessary to the exercise of the power by him; that the information can come through no other channel, and that, unless furnished with it, he can make no deduction, although he knows from entirely trustworthy information there is an unexpended balance on hand. In this view we do not concur. If it were correct, then large sums belonging to the State might remain idle in the treasuries of the asylums, simply because the Superintendents and Chairmen of their Boards had not reported the money as unexpended.

It was likely that an asylum might not use all the money allowed to it for its support during a certain period. It was therefore provided that its Superintendent and the Chairman of its Board of Managers, the two persons who were most likely to know it, should in such an event report it to the Auditor. The object of the statute was to give him knowledge of the fact. True, it directs them to report the fact and says the Auditor shall charge up to the asylum upon the next allowance " any unexpended balance reported by the Chairman of the Board of Managers and the Superintendent;" but it does not provide that he shall do so only upon their report of the fact, and neither the language or spirit of it admits of such a construction. Such an interpretation might often defeat the purpose of the enactment. Its object was to give knowledge to the Auditor of the unused fund that he might apply it, and it was not intended to limit his doing so by a performance of duty upon the part of the officers of

the asylum, when in the absence of it the fact should otherwise become known to him.

It is said that the Board had no right to authorize the expenditure, and that it could only be done by legislative direction. It seems to us this had been given. Aside from the implied powers necessarily arising from and coupled with the position, the Board had, by the general statute above cited, the express power to use and apply the means of the institution in any way best calculated in their judgment to further the purposes for which it had been established.

The principal question is whether the money within the real meaning of the statute was an unexpended balance. True, it had not been checked out, nor had liabilities been yet created to consume it. If so, then by the terms of the statute no question would exist. It had, however, been appropriated and set apart for a special purpose to make a necessary improvement then in course of construction. It had been ordered to be charged up to the building account. Without the improvement the lives of the unfortunate inmates would soon be in danger. It was of the highest importance that the repair should be made. No higher duty attached to the Board. As winter approached the work could not be prosecuted owing to the use which had to be made of the premises. We allude to these facts because, if the view of the Auditor is to prevail, no improvement of any magnitude in one of these institutions could well be made. Money would be needed probably as it progressed, and yet, although it may have been set apart for the purpose by the Board, if it had not in fact been checked out or liabilities created to consume it before the end of the quarter,

it would have to be charged up to the asylum and deducted from the amount then coming to it; and as all of this sum might be necessary for the support of the inmates during the next quarter, it results that the prosecution of the improvement would have to cease. Did the statute intend such a result?

Suppose in the latter part of December the roof of the asylum should be blown off and other damage done to the buildings; there is money enough on hand to make the necessary repairs, and they are actually commenced; but the end of the quarter arrives with the first of January following and the money has not then been paid out, although *bona fide* set apart to make the repairs, nor have liabilities been created to consume it. In such a case, looking to the spirit and meaning of the statute, is the money to be regarded as an unexpended balance, to be deducted from what is then due the asylum, resulting in a cessation of the work? We do not think so. True, if the statute expressly provided that in such a case the deduction must be made it would have to be followed, however disastrous the consequences might be. There would then be no room for construction. But such a state of case does not exist here.

The object of construction is to arrive at the true meaning of a statute. The legislative will is to be arrived at, and an absurdity will not be presumed. The provision of the statute in question was certainly a wise and laudable one. It was intended to compel the covering back into the State Treasury from time to time of any balance in the hands of the asylum over and above the expenses and repairs of the institution, but it certainly was not thereby intended to prevent the Board from discharging

the duties imposed upon them, thus rendering the institution uncomfortable and unsafe, and perhaps imperiling its very existence.

The construction contended for requires that no repairs can be undertaken, however necessary, and, although the money may be on hand to make them, unless they can be paid for or all the liabilities attending them be created before the time for the next quarterly report from the officers of the institution.

One of the meanings given by all lexicographers of "expend" is "to dispose of," and in our opinion, when the Board had exercised the power, which they clearly possessed, and had set apart the money then on hand for a specific purpose, it was within the fair meaning of the statute and the intention of the law making power no longer unexpended.

The judgment is therefore affirmed.