No. 21,333.

THE STATE OF KANSAS, *ex rel.* S. M. BREWSTER, as Attorney-general, etc., *Plaintiff,* v. O. H. BENTLEY, as Mayor, etc., et al., as The Board of Commissioners of the City of Wichita et al., *Defendants.*

SYLLABUS BY THE COURT.

1. GOVERNMENT OF CITIES— *"City Manager Plan"— Statute Constitutional and Valid.* The act of the legislature entitled "An act relating to the government of all cities in Kansas, and to establish an optional form of government," approved February 17, 1917, is a valid and constitutional enactment, so far as its operation and effect is challenged in this action.

2. SAME—*City Election—Requisites of Petition Therefor.* The provision in the act which requires the mayor to call a special election to submit to the electors the question of the adoption of the new form of government upon the filing of a petition "signed by not less than

"twenty-five per cent of the total number of legally qualified electors voting for mayor at the last preceding city election" is construed to mean that the petition must be signed by twenty-five per cent of the number of legally qualified votes cast for mayor at the last election, without reference to the individuals who cast them.

Original proceeding in mandamus.   Opinion filed April 7, 1917.   Writ allowed.

*S. M. Brewster*, attorney-general, *Chester I. Long, Thomas C. Wilson*, and *Earl Blake*, all of Wichita, for the plaintiff.

*James A. Conley*, of Wichita, for the defendants.

The opinion of the court was delivered by

PORTER, J.:   This is an original proceeding in mandamus, and the question to be determined is whether an act of the legislature, approved February 27, 1917, which authorizes cities to adopt what is known as the city manager plan, is constitutional.

The alternative writ, issued less than a month after the law was enacted, directed the defendants, the mayor, the board of commissioners, and the clerk of the city of Wichita, to print and distribute ballots and submit to the electors the question of adopting the provisions of the act at the regular election April 3.   The election resulted in a majority of votes for establishing the new form of government.   Whether the peremptory writ shall issue depends upon the validity of the statute.

Since 1909 the city of Wichita has been governed by the city commissioners law.   The new act is entitled "An act relating to the government of all cities of Kansas, and to establish an optional form of government."   It applies to all cities which shall adopt its provisions. ' It creates a governing board to consist of the number of commissioners provided for in the commission government act, and declares that "no distinction shall be made in titles or duties among the commissioners, except as the board shall organize itself for business."   The chairman chosen by the commission takes the title of mayor during the year and becomes the head of the city "on formal occasions."   Each commissioner draws a nominal salary, in

no case to exceed $100 a year.  The commission or governing board is empowered to pass all ordinances and to provide for such offices as are necessary to carry out the provisions of the act and fix the salaries thereof.

The act requires the commission to appoint a city manager in whose hands the administration of the business of the city is placed.  He holds office "at the pleasure of the board," is chosen "solely upon the basis of administrative ability," and without reference to residence qualifications.  He receives a salary to be fixed by the commission, and is held responsible to the commission for the administration of all the affairs of the city.  Administrative departments of law, service, public welfare, safety, and finance are created.  All appointments "except department heads" are made by the manager, and "department heads" are required to report to him.  The act also establishes what is known as the "budget system" of accounts and expenditures.

The foregoing presents a summary of the principal changes established in the government of cities adopting the act.

We have often declared that every presumption must be indulged to uphold an act of the legislature and that every reasonable doubt will be resolved in its favor.  The defendants realize that the statute in question lies intrenched behind these presumptions.  More than twenty reasons are presented for striking down the statute, and the attack is made from all sides and leveled at every supposed salient, the general assault being preceded by what may be regarded as a *"tir de barrage"* or *"curtain of fire,"* consisting of objections that the title of the act is not sufficient, and because of this and other reasons the act is in conflict with article 12, section 1 of the state constitution, and that it attempts to delegate legislative powers in violation of section 2 of the bill of rights.

The title of the act is sufficient.  The act contains but one subject, which is clearly expressed in the title, and which is, to authorize the establishment of an optional form of government in all cities.  The constitution does not contemplate that the title shall be an abstract of the entire act.  (*Rural School District v. Davis,* 96 Kan. 647, 152 Pac. 666.)  The contention that the title is too narrow on the ground that the act changes

the primary election law will be considered presently in connection with other general objections to the act.

The act is in no sense a special one. It is as general as possible for the legislature to make it covering the subject. It applies to all cities which see fit to adopt or submit for adoption the city manager plan of government. It is said, and the court takes judicial notice of the fact, that a dozen or more cities adopted its provisions at the recent election. The decision in *Cole v. Dorr*, 80 Kan. 251, 101 Pac. 1016, upholding chapter 114 of the Laws of 1907, empowering cities to adopt the commission form of government, completely answers the contention that the act attemps to delegate powers. (See, also, *Wulf v. Kansas City*, 77 Kan. 358, 365, 94 Pac. 207.)

A general assault is made against the act on the ground that it violates article 12, section 5 of the state constitution. It is said that the governing board or commission is permitted to employ a city manager and fix his salary without restrictions as to the amount. What has come to be known as the city manager plan, or Dayton plan, of administration of municipal affairs contemplates the employment by the city of an executive experienced in business and with technical skill and knowledge which will enable him to conduct the city's business so far as practicable just as a great private business is successfully conducted, and thereby substitute efficiency and economy for inefficiency and waste. The legislature was not proceeding blindly in leaving the matter of his salary to the discretion of the governing board. The fixing of his salary was not only left with the board, but the act expressly declares that in selecting the manager, qualifications as to residence should not control, so that if deemed advisable the board may choose as manager a nonresident of the state. Recognizing the difficulty in fixing a salary without information as to the amount necessary for a city to pay in order to secure the services of a manager suitable to its requirements, the legislature also saw fit to leave to the discretion and judgment of the commission the determination of what the city could afford to pay for the services of its manager. In the wisdom of the legislature no special restriction was deemed necessary to prevent an abuse of power in fixing the salary of the manager.

In *Wulf v. Kansas City*, supra, the validity of chapter 115 of the Laws of 1907 was attacked on the ground that it attempted to delegate to a park board the power to incur indebtedness and levy taxes in violation of this same section of the constitution. Section 4 of the act authorizes the park board at will "to appoint, employ and discharge such engineers, surveyors, attorneys, agents, clerks and servants as it may deem necessary, and fix the duties and compensation of all such appointees." Section 8 of the act authorizes the park board to "create and provide for the payment of debts; draw warrants upon the city treasurer; purchase, possess, sell and convey real and personal property; make contracts; issue bonds; levy taxes and special assessments, and do all other acts proper or necessary to carry out the provisions of this act, subject only to the limitations contained in this act." In many other respects the legislature conferred power and authority limited only by the judgment and discretion of the park board. In passing upon the contention that the act is repugnant to article 12, section 5 of the constitution, the following extract from the opinion in the early case of *Hines v. City of Leavenworth,* 3 Kan. 186, 204, was quoted:

"When a law is passed embracing any of the subjects mentioned in the fifth section, it is the duty of the court, when called upon, to determine whether it contains restrictions, and if it does contain them the law must be held to be valid, notwithstanding the members of the court might doubt their sufficiency to prevent abuses. It is a subject wholly under the control of the political department of the government. Whatever the legislature determines to be a sufficient restriction, if it be a restriction at all, must be final."

It was held that the park board act was not in conflict with section 5 of article 12 of the constitution, and further that it does not attempt to delegate legislative powers. It is urged, however, that the act is in direct conflict with this provision of the constitution (art. 12, sec. 5), because it is said it places no restrictions on the powers of cities in taxation, assessment, borrowing money, contracting debts and loaning their credit. Aside from creating the office of a general manager upon whose shoulders are placed all the purely administrative functions heretofore exercised by the commissioners or by the mayor and council, and directing that certain administrative departments be established, the only other radical

change in the plan of city government which the new act provides for is the budget system, which is especially designed as a restriction upon the power of the city in contracting debts. The very purpose of the budget is to compel the adoption of practical business methods in the appropriation and expenditure of the finances of the city. To this end the act requires the manager to prepare and submit to the governing body a yearly budget and to keep the city fully advised as to its financial condition and needs. The public is to have ample opportunity to be heard upon the various items of the proposed budget before it is finally adopted by the governing body. Section 14 of the act provides:

"SEC. 14. The accounts of the city shall be kept by the treasurer of the city in such a way that a full statement of the city finances may be made each month. Expenditures shall be legal only on the basis of appropriations in the budget, and on the authority of warrants issued by the director of finances countersigned by the manager. In no case shall warrants be issued to exceed the balance in such fund. . . . Opportunities for public hearings on the making of the city budget shall be given during the two weeks preceding the submission of the estimates to the commission. The budget shall then be printed in the city papers and a further public hearing given by the commission." (Laws 1917, Senate bill No. 6, § 14.)

These restrictions were deemed by the legislature to be sufficient, and since they are restrictions, the court has no power to strike down the law on the ground that the court might differ with the legislature as to their sufficiency. Moreover, it must be remembered that all the restrictions on the power of cities in taxation, assessment, contracting debts, and borrowing money which are imposed by the laws in force when the act was adopted remain in full force and effect. The act now under consideration contemplates merely a modification of the commission form of government in those cities adopting its provisions. The governing board is controlled by the provisions of the laws already in force as to cities of a given class, subject only to the restrictions and limitations imposed by the new act. The commission or governing board enacts all ordinances of the city, retaining all the legislative functions as before; it levies the taxes, determines the policies, and decides generally what shall and shall not be done. It must, however, appoint a general manager, to whom the act

gives power and authority to administer the business affairs of the city. The board decides what is to be done; the manager proceeds to do the thing in the way that seems best to him as the most effective and economical in the interests of the city.

It is contended that the act is in conflict with other statutory requirements, especially the general election laws, which provide how poll books shall be used in registration. It appears that the registration books were closed ten days before the election, as provided by section 1069, General Statutes of 1915. Of course, they remained closed until after election, and if, as it is claimed, 1500 voters were prevented from expressing their views upon the proposed adoption of the new law they were disfranchised solely because of their neglect to register. It is said that the act conflicts with the primary law, more particularly sections 4175 and 4176 of the General Statutes of 1915, the former of which requires the city clerk to publish the names of candidates 45 days preceding the primary, and the latter providing for the filing of nomination papers not less than forty days before the primary. In city elections under the commission form of government parties are not recognized, and the primary law provisions "for the organization and government of political parties" have no application. The city manager act leaves the general election laws as they were under the commission form, in so far as practicable. The act became a law February 17, 1917, and it was recognized that, as the election for commissioners would occur April 3, the new act could not be submitted in time for adoption this year if all the provisions of the election laws were observed. In section 16, therefore, the act provides that in any election called in the year 1917 for voting upon the adoption of the act the election should be held within fifteen days of the filing of the petition, and candidates should be permitted to file their petitions within ten days of the election. These provisions did not repeal the general laws applicable to elections under the commission form act, either impliedly or otherwise. The general law continued in force, except as the legislature in its wisdom saw fit to provide in those cities where a petition asked for submission of the new law at the general election in April. The general election

laws not having been repealed do not need to be revived; and for the same reason it was not necessary to set out in the new act the sections of the old law which were for the time being superseded. The legislature always has the power by the adoption of a later act to suspend the operation of an earlier one, and where two acts are in conflict the later expression of the legislative will controls. (*Topeka v. McCabe,* 79 Kan. 329, 99 Pac. 602; *Hicks v. Davis,* 97 Kan. 312, 318, 154 Pac. 1030; 26 A. & E. Encycl. of L. 761.)

The civil service law has not the force of a constitutional provision; it may be repealed as to one class of cities and remain in effect in others. The legislature of 1911 (ch. 95, § 6) suspended its operation in all cities of·less than 30,000 population governed by commissions. In the act now under consideration the manager is given the option to require the appointment of a civil service commission or not as he sees fit.

The last of the numerous contentions to be considered is one which is not directed against the validity of the act, but which is·based upon the alleged insufficiency of the petition asking for the submission to the voters of the new law. It calls for a construction of the provision in section 16 which requires the mayor to call the election upon the filing of a petition with the city clerk "signed by not less than twenty-five per cent of the total number of legally qualified electors voting for mayor at the last preceding city election." The defendants' claim is that this means twenty-five per cent of the same persons who actually voted for mayor two years before. The certificate of the clerk attached to the writ shows 12,580 votes cast for mayor at the election in 1915 and more than 3812 duly registered voters signed the petition. As suggested by the plaintiff, "unless the legislature intended that the wishes of the voters of two years ago, many of whom may have moved elsewhere and some of whom may have died, should be ascertained, rather than the wishes of the present citizens and voters, the petition is valid, as 3145 qualified signers are all that is required, while more than 3812 actually petitioned." What the legislature had in mind, of course, was one-fourth of the electors. If that percentage of the voters signed the petition, it was deemed sufficient to justify the submission of the question. Usually, in similar statutory provisions, the last census, or the num-

ber of votes cast for some particular office at the last election, is taken as the basis from which to calculate the required number of petitioners.  In this case it was the number of legally qualified votes cast for mayor at the last election, without reference to the individuals who cast them.  Any other construction seems unreasonable.

Notwithstanding the length of this opinion, it must be said that the defendants with all their numerous objections to the act have not succeeded in raising in our minds the slightest doubt as to its validity.

It follows that plaintiff is entitled to judgment, and the peremptory writ will be allowed.