DANIEL N. KIRBY, LUTHER ELY SMITH and PAUL J. KAVENEY, as Members of and Constituting and Composing the CIVIL SERVICE COMMISSION of the City of St. Louis, Appellants-Respondents, v. LOUIS NOLTE, as Comptroller of the City of St. Louis, Appellant-Respondent, and THE CITY OF ST. LOUIS, Respondent.—164 S. W. (2d) 1. Consolidated Causes Nos. 38082, 38083.

Court en Banc, July 25, 1942.

1016

*Julius T. Muench* for Louis Nolte, as Comptroller of St. Louis, appellant-respondent.

*Charles P. Williams* for Daniel N. Kirby et al., constituting the Civil Service Commission of St. Louis, respondents-appellants.

ELLISON, C. J.—These are cross-appeals from a declaratory judgment of the circuit court of the City of St. Louis, construing certain provisions of the new Article XVIII of the City Charter, which was adopted at a special election on September 16, 1941. The Article purposes "to provide a modern and comprehensive system of personnel administration" with civil service regulations designed to classify all positions; measure the fitness of the occupants thereof; evaluate their services and pay them accordingly: and to provide indefinite (long time) tenure of employment and advancement on a merit basis, with retirement benefits. All of this will be under a Department of Personnel, headed by a Director of Personnel, with a Civil Service Commission and such other employees as may be needed. The Director must be selected, the rules and plans made, ordinances recommended, and the framework of the so-called "Merit Plan" set up within one year—by September 15, 1942. This important preliminary work is the task of the plaintiff members of the Civil Service Commission, hereinafter called the Commissioners. They have come into controversy with the defendant City Comptroller over the construction of certain provisions of the new Article as applied to phases of their work. Four questions have been presented for judicial solution.

Under Sec. 7(e) of the new Article, the Civil Service Commission must hold a competitive examination for the position of Director

of Personnel, and certify the eligibles emerging therefrom to the Mayor, who, under Sec. 8 of the Article, shall appoint the Director from the three eligibles standing highest on such certification. Under Sec. 8 he must be an expert and need not be a resident of the City of St. Louis when examined and appointed.. The same section further provides that in preparing for said examination the Commission "shall secure such information and assistance as may be practicable in formulating the fitness tests for Director and rating the results, ▮▮ from persons experienced in public personnel administration." The Commissioners' petition states they propose to obtain this information, assistance and advice from recognized nonresident experts; and asserts their discretionary right to employ these experts and pay their fees and expenses out of the appropriation for the Department. . .

The Defendant Comptroller disputes their right to do this and says that by virtue of his office he has a right to challenge their action. He is an elective officer, a member of the Board of Estimates and Apportionment, and sits with the Board of Aldermen without a vote. Under Sec. 2, Art. XV of the Charter he is head of the Department of Finance, and exercises a general supervision over all the fiscal affairs of the City, and over all its property, assets and claims, and the disposition thereof. It is his duty to preserve the City's credit. He is the general accountant and auditor; and the section says he "shall control and continually audit" the fiscal accounts, records, settlements and reports of the several departments and offices of the City. He issues all warrants for disbursements. In particular, the section provides: "He shall see that no contract liability is incurred . . . without previous authority of law or ordinance." And Sec. 9 of the Art. XXV requires all city contracts to be made by him, except as otherwise provided by law; and that he shall countersign these excepted contracts.

Further, subsection (s) of Sec. 3 of the new Article XVIII calls for the adoption of civil service rules requiring reports to be made to the Comptroller of new or changed positions in the Department of Personnel and the attendance record of its employees, these reports to furnish a basis for his audit and approval of payrolls as complying with the Article, rules and ordinances. Also subsection (t) exacts rules making the Comptroller's audit of payrolls a condition precedent to the payment of any claim or account for personal services; and forbids him to approve the same "except on evidence satisfactory to him that the person named has been lawfully employed in a position duly authorized," and is entitled to payment of the amount shown.

In reliance on the foregoing charter provisions the Comptroller's answer not only disputes the Commissioners' right to employ and pay said experts; but more generally denies their right to pay appropriated funds for any purpose, "without first demonstrating" to him that such action is properly within the purposes of the ap-

propriation. On the specific issue stated the trial court ruled for the Commissioners: that they were authorized to employ the experts, resident or nonresident, and to agree upon and pay the fees for their services together with the expenses of nonresidents of St. Louis for traveling, and for maintenance there. The defendant Comptroller has appealed.

We think the circuit court's conclusion was correct and affirm its ruling. Undoubtedly a municipal corporation or a special board or department thereof, can employ an expert, resident or nonresident, for a particular special service when incident to an authorized project and not otherwise provided for. [44 C. J., sec. 4036, p. 112; 15 C. J., sec. 238, p. 546; 2 A. L. R. Annotation, p. 1217; Parker v. Pace, 190 Ark. 950, 82 S. W. (2d) 259, 260(1); Taylor v. Riney, 156 Ky. 393, 161 S. W. 203, 204(1); Pflueger v. Kinsey, 320 Mo. 82, 89-90, 6 S. W. (2d) 604, 606(1); Haskins v. City of De Soto (Mo. App.), 35 S. W. (2d) 964, 967.]

The trial court did not rule expressly on the broader question as to the nature and extent of the Comptroller's general auditorial and supervisory powers over the Commissioners in making contracts involving the expenditure of city funds—in other words, whether the Commissioners do or do not have the right to use, pay or obligate themselves to pay, any part of the funds appropriated to the Department of Personnel (italics ours) "without *first demonstrating*" to the Comptroller that such action is properly within the purview of the appropriation.

The new Article XVIII vests broad power in the Civil Service Commission, including such implied powers as fairly come within the intendment of the grant and such discretion as is legitimately necessary in the exercise of those powers. The discretion must be sound and cannot be arbitrary or abused. [18 C. J., p. 1134; State ex inf. McKittrick v. Wymore, 345 Mo. 169, 181, 131 S. W. (2d) 979, 986(10).] On the other hand, the Comptroller is an important officer in the city government. He too has broad powers, in the exercise of which he is vested with a sound discretion and for the most part discharges a quasi-judicial function, though his rulings are not judgments. [4 Words and Phrases (Permn. Ed.), p. 816; State v. Weatherby, 344 Mo. 848, 856(4), 129 S. W. (2d) 887, 891(6); State v. Thompson, 337 Mo. 328, 337(4), 85 S. W. (2d) 594, 599(5); State ex rel. McDowell v. Smith, 334 Mo. 653, 666, 67 S. W. (2d) 50, 54.]

As Sec. 2, Art. XV of the Charter expressly provides, the Comptroller may challenge contracts made by other Departments for illegality; and this would include financial obligations contracted by the Civil Service Commission arbitrarily or in abuse of its discretion—which would amount to illegality. But this does not mean the Comptroller's discretionary powers are coordinate with or superior to those of the Department of Personnel in its sphere. The Comp-

troller cannot control the policy making powers or the normal functioning of that Department. The fact that contracts (of that character) must be countersigned by him, under Sec. 9, Art. XXV of the Charter, does not give him the right to make them. If they involve the expenditure of money out of appropriations he can disapprove them when submitted, only on the ground that they are unauthorized by the Constitution, statutes, charter or ordinances, or because they manifest a clear abuse of discretion. Action beyond that limit would convict the Comptroller himself of an abuse of discretion. Paraphrasing what was said in State ex rel. Hensick v. Smith, 5 Mo. App. 427, 428, to hold otherwise would be to say that the people of St. Louis have committed to the Comptroller the power of suspending important functions of the Civil Service Commission. This is as far as we can go in ruling this rather abstract issue.

■ The Civil Service Commission is required to make rules, amendments and recommendations from time to time for the administration and enforcement of the new Article and ordinances adopted in pursuance thereof. These rules must cover a classification plan for all positions in the Department; a systematic compensation plan; another prescribing merit and fitness tests; a plan for retirement benefits; regulation of hours of duty, holidays, attendance and absence; and other matters mentioned in the new Article. The Commissioners are all lawyers and receive only a per diem of $15 for attending meetings of the Commission, aggregating not more than $1680 per annum. The Article does not require that they be experts in personnel administration.

After extensive inquiry they have determined to employ and pay a reputable and competent "administrative service advisory organization" with headquarters at Chicago, Illinois, to provide technical assistance and advice in this work on a cost basis. This will necessitate a survey of conditions by a staff of experts from the organization, who must spend two or three months in St. Louis for that purpose. The defendant Comptroller asserts the retention of these nonresident experts is unnecessary, and payments to them out of public funds for fees and expenses would be ultra vires, because more reliable information can be obtained from residents of St. Louis, who have been familiar with conditions there. By his answer he therefore serves notice that he will refuse to audit or approve such disbursements and to sign warrants therefor. The circuit court ruled this contention against the Comptroller, and he appeals. We affirm that ruling. In our opinion the question whether these nonresident experts should be employed is a question of administrative policy with which the Comptroller has nothing to do.

■ The Commissioners allege that among the probable applicants for appointment as Director of Personnel are many persons, apparently qualified, who are nonresidents of the State. Section 8

of the new Article XVIII, as already noted, expressly provides that the Director "need not be at the time of examination or appointment, a resident of the City of St. Louis." Believing the aforesaid nonresident applicants are eligible to the position under this provision, the Commissioners desire to have them come to St. Louis for conferences and scrutiny, and in order that they may be subjected to proper tests bearing on their qualifications and fitness for the position. To that end the Commissioners intend to pay the traveling and maintenance expenses of said applicants on these trips. The defendant Comptroller asserts the financial outlay thus entailed would be illegal, and declares he will refuse to audit and approve the same because the nonresident applicants will be ineligible to the position of Director of Personnel under Sec. 10, Art. VIII of the Missouri Constitution; and therefore payments of public funds to them for purposes looking to their certification by the Commission as eligibles would be unauthorized by law. The ▪ trial court ruled this contention against the defendant Comptroller and he appeals.

Sec. 10, Art. VIII of the Constitution cited by the Comptroller provides that: "No person shall be elected or appointed to any office in this state, civil or military, who is not a citizen of the United States, and who shall not have resided in this state one year next preceding his election or appointment." The plaintiff Commissioners assert this provision is inapplicable to the Director of Personnel for one or both of two reasons. They contend: (1) that it refers only to officers under the *state,* not to municipal officers; (2) that the position is not an "office" within the meaning of the Constitution.

In support of their first contention that the constitutional provision applies only to officers under the state government, the Commissioners' learned counsel cites six cases[1] from other jurisdictions dealing with constitutional provisions which forbade any person in the State from holding "more than one lucrative office at the same time." All these held the provision did not prevent the occupancy of a municipal and a state office coincidently. The same conclusion was reached in another case[2] where a Georgia statute was substantially to the same effect. In an early Delaware case[3] the constitution made a clergyman incapable of holding "any civil office in this state." The court ruled this provision inapplicable to municipal offices, one judge reasoning that the word "state" did not refer to the state territorially but to its framework of government. All these cases except the Delaware case are in line with the weight of authority, L. R. A. 1917A, Annotation, p. 231, though there are two decisions to the contrary:

---

[1]Boswell v. Thompson, 163 Tenn. 445, 43 S. W. (2d) 495; Dorsey v. Vaughan, 5 La. Ann. 155; Hood v. Dahlgreen, 6 La. Ann. 175; State v. Taylor, 44 La. Ann. 783; State v. Phenix, 134 La. 329; State ex rel. Platt v. Kirk, 44 Ind. 401.

[2]Long v. Rose, 132 Ga. 288, 64 S. E. 84.

[3]State v. Wilmington, 3 Del. 294.

Darling v. Brunson, 94 S. C. 207, 77 S. E. 860, and Grimes v. Holmes, 207 N. C. 293, 176 S. E. 746, 748. The minority rule on double office holding is made the law of Missouri by Sec. 18, Art. IX of the Constitution in cities of more than 200,000 inhabitants. [Nickelson v. City of Hardin, 282 Mo. 198, 221 S. W. 358.]

But the foregoing decisions run on the theory that the basic intent is to enjoin *incompatible* office holding. The plain purpose of Sec. 10, Art. VIII of our Missouri Constitution is to render any person *ineligible* to "any office in this state, civil or military," who is an alien or who has not resided in the State for a year next before his election or appointment. Similarly Sec. 2 of the same Article requires one year's residence in the State as a condition precedent to the right to vote. Neither section is archaic. Both were resubmitted by the Constitutional Convention and adopted by the people in 1924, the latter section being changed to exclude from the electoral franchise even those aliens who had declared their intention to become citizens. Counsel argues that Sec. 10 should be applied only to state offices because it specifies any office "civil or military," and since a military office must be a state office therefore the same is to be implied of the civil offices designated. But that does not follow. If Sec. 10, Art. VIII does not exclude both aliens and nonresidents from *all public offices* then the whole official roster in every city and village in this State, from the mayor down, can be filled by aliens or residents of another state—unless prohibited by statute or judicially vetoed on grounds of public policy.

The almost unanimous view throughout this country has long been that such persons are not eligible to public office. In State ex inf. Crow v. Vallins, 140 Mo. 523, 537, 41 S. W. 887, 890, the dissenting opinion of two judges was that the chief of police of Kansas City was a municipal officer and that Sec. 10, Art. VIII of the State Constitution applied to him as such. The majority opinion ruled it was unnecessary to decide that question because he had been illegally appointed anyway. State ex rel. Crow v. Hostetter, 137 Mo. 636, 646, 39 S. W. 270, 271, referred to the section as a "general command of the organic law (applicable) to all offices." Illinois has a constitutional provision identical with ours except for one immaterial word. Against the same contention made here, the Supreme Court of that state held "the language is not limited to state officers, but is broad enough to apply to all public officers within the boundaries of the state." [People ex rel. Hoyne v. McCormick, 261 Ill. 413, 419, 103 N. E. 1053, 1056(3).]

An annotation in 120 A. L. R., p. 674, cites cases holding that when a state constitution or statute requires an officeholder to be a qualified elector, it renders a nonresident ineligible. But none of these deals with municipal officers. However there are several decisions that do bear on the question of the applicability of other constitutional

provisions to such officers. Thus, State ex inf. Crow v. Lund, 167 Mo. 228, 238, 66 S. W. 1062, 1064, held that Sec. 5, Art. XIV of our State Constitution, relating to the *tenure* of "all officers," applied to municipal officers. And Monette v. State, 91 Miss. 662, 44 So. 989, 124 Am. St. Rep. 715, held a city policeman was an officer and must be appointed for a *definite tenure* as required with respect to "officers" by the state constitution. In State ex rel. Rupp v. Rust, 4 Ohio Dec. 329, where a statute provided for *female* members on the Board of Workhouse Directors of Cincinnati, it was held the act conflicted with a provision of the Ohio Constitution requiring the occupant of "any office in this state" to possess the qualifications of an elector, since another constitutional provision limited the right of suffrage to males. Likewise, two Kentucky cases decided, respectively, that the city manager of Lexington and the librarian of the Public Library in Louisville were officers; and could not receive a *salary* larger than $5000 under a constitutional provision applicable to all "public officers" except Governor. [City of Lexington v. Thompson, 250 Ky. 96, 61 S. W. (2d) 1092; Alvey v. Brigham, 286 Ky. 610, 150 S. W. (2d) 935, 135 A. L. R. 1024.]

Cases dealing with eligibility requirements for city manager seem to be most nearly in point in the instant cause. In State ex rel. Brewster v. City of Wichita, 100 Kan. 399, 164 Pac. 290, the constitutionality of a legislative act was challenged. It provided a city manager should be chosen solely on the basis of administrative ability and "without reference to residence qualifications." The act was upheld, thus impliedly sustaining the quoted provision. But the constitution of that state imposes no residential or electoral qualification for office except in a few specified instances, of which the foregoing is not one. [See Wright v. Noell, 16 Kan. 601; State ex rel. Gregory v. Irey, 116 Kan. 21, 22, 225 Pac. 1050.] However, the Gregory case ruled an alien could not be elected probate judge even without any constitutional or statutory restriction.

On the other hand, McClendon v. Bd. of Health, 141 Ark. 114, 121, 216 S. W. 289, 291(2), and State v. Sheldon, 29 Wyo. 233, 247, 213 Pac. 92, 96-7, both held statutory provisions unconstitutional which said, in the one case, that a city manager "need not be a resident of the city at the time of his appointment;" and in the other, that he "need not, when appointed, be an inhabitant of the municipality or of this state." The applicable provision of the Arkansas Constitution declared "no person shall be elected to or appointed to fill a vacancy in any office who does not possess the qualifications of an elector." The Wyoming constitution provided: "no person except a qualified elector shall be elected or appointed to any civil or military office in the state." And the constitutions of both states made citizenship of the United States and a year's residence in the state qualifications for suffrage.

We have reviewed the decisions at some length because of our reluctance to hold unconstitutional in any particular the ambitious experiment in municipal government which the City of St. Louis is undertaking. But we cannot escape the conclusion that the clause in Sec. 8 of the new Article XVIII of the Charter, providing the Director of Personnel "need not be at the time of examination or appointment, a resident of the City of St. Louis," would be unconstitutional if construed to mean that an alien or nonresident of this State may serve in the position—assuming it is an "office" within the meaning of that term as used in Sec. 10, Art. VIII of the Constitution.

The clause literally is valid in saying the Director when appointed need not be a resident of the *city*, for the constitutional provision only requires that the appointee be a citizen of the United States and a resident of the *state* for the preceding year, which latter he could be without being a resident of the City. It does not require that he be a voter; hence the provision of Sec. 2, Art. VIII requiring sixty days' residence in the city is inapplicable. But he cannot be an alien or nonresident of the State, though even this ineligibility would not be a bar unless it existed at the time of his induction into office. [46 C. J., sec. ▪ 33, p. 938; State ex rel. Mitchell v. Heath, 345 Mo. 226, 232(4), 132 S. W. (2d) 1001, 1005(7).] We should add, also, that even if and insofar as Sec. 8 of the new Article be considered unconstitutional in the above respect, this would not invalidate it otherwise. It was so held in the McClendon case, supra, 141 Ark. l. c. 121, 216 S. W. l. c. 129(3); and the Sheldon case, supra, 29 Wyo. l. c. 248, 213 Pac. l. c. 96-7.]

This leaves only the question whether the position of Director of Personnel is an office within the meaning of Sec. 10, Art. VIII of the Constitution. A city manager was held to be an officer in the McClendon and Sheldon cases just referred to. The same was ruled in City of Lexington v. Thompson, supra, 250 Ky. l. c. 98, 61 S. W. (2d) l. c. 1092, although the statute creating the position expressly declared the incumbent should not be an officer, but only an executive agent. The fact was conceded in the Grimes case, supra, 207 N. C. l. c. 293, 298, 176 S. E. 746, 748. In a leading decision, Sarlls v. State, 201 Ind. 88, 107, 166 N. E. 270, 277(27), 67 A. L. R. 718, 731, a constitutional provision requiring that "all . . . town officers shall reside within their . . . towns," was treated as comprehending city managers but held to apply only while they were *serving* as such. In the same way the lesser municipal positions dealt with in the other cases cited were held to be offices in the constitutional sense.

And in State ex inf. McKittrick v. Bode, 342 Mo. 162, 113 S. W. (2d) 805, recently decided by this court en banc, the majority opinion held the Director of Conservation under the Conservation Commission was a public officer. Nevertheless it ruled he could hold his office,

though he had not resided in the State a year as required by Sec. 10, Art. VIII of the Constitution. The theory of the decision was that since the Commission and the office were created by a subsequent constitutional amendment (now Sec. 16, Art. XIV) which authorized the Commission to determine the qualifications of the Director, the provisions of the latter would override those of the earlier section so far as the two were in conflict. But in the instant cause the Charter of St. Louis cannot control over the Constitution.

Three of the seven judges concurred in the result only, in the Bode case. They contended the Director of Conservation was not a public officer because the constitutional amendment vested all substantial power in the Commission and made the Director a mere administrative agent without independent authority, fixed duties, tenure or salary. And it must be conceded there have been for a long time a number of high and dignified administrative positions in this State which have not been regarded as offices in the constitutional sense with a civic or residential requirement, such as the presidents of state institutions of higher learning; chief engineer of the State Highway Commission (Sec. 8744, R. S. 1939, Mo. R. S. A., sec. 8744); and the health supervisor of state eleemosynary institutions (Sec. 9274, R. S. 1939, Mo. R. S. A., sec. 9274). These positions must be filled by *experts*; and to get them it is sometimes necessary to go outside the State. The law should not be too restrictive in such matters.

The writer was the author of the minority opinion in the Bode case, and would venture to urge the same views again here—if the facts in this case were no stronger than those in the Bode case. But they are. As said in the majority opinion in that case "it is not possible to define the words 'public office or public officer.'" But the opinion went on to say "courts and text writers agree that a delegation of some part of the sovereign power is an important matter to be considered." That rather vague definition was the basis of the majority opinion. But the definition is clear and satisfying if to it the further requirements be added, that such power must be substantial and *independently* exercised with some continuity and without control of a superior power other than the law. [State ex rel. Barney v. Hawkins, 79 Mont. 506, 257 Pac. 411, 418, 53 A. L. R. 583, 594, Annotation; City of Lexington v. Thompson, supra, 250 Ky. l. c. 99, 61 S. W. (2d) l. c. 1093; State ex rel. Newman v. Skinner, 128 Ohio St. 325, 191 N. E. 127, 93 A. L. R. 331; State ex rel. Pickett v. Truman, 333 Mo. 1018, 1022(2), 64 S. W. (2d) 105, 106(2).]

In order to eliminate political control and to establish a bona fide civil service, the new Article XVIII has made the office of Director of Personnel powerful and independent in governmental, not proprietary, matters. That is the very spirit of it. Let us compare the facts here with those in the Bode case. In this case the Director **is**

not appointed by the Commission of the ■ Department as was the Director in the Bode case; but by the Mayor (along with most other department heads) from the highest three eligibles in a competitive examination given by the Commission. He does not serve as Director at the pleasure of the Commission, as was true of the Director in the Bode case; but can remain in office for life unless removed for nonfeasance, misfeasance or malfeasance, on charges preferred and presented at a public hearing before the Civil Service Commission after ten days' notice. And even then the Commission can only *recommend* his removal to the Mayor, who may reject the recommendation.

Further, in the Bode case the Commissioners were required to be qualified with knowledge of the subject matter of their trust; here they are not. Also, in the Bode case, the *control and management* of all the State's wild life resources and appurtenant property, and the *administration* of all laws pertaining thereto were vested in the Conservation Commission, not the Director. In this case Sec. 5 names the officers of the Department of Personnel in this order of importance: it says the department "shall consist of a director of personnel as head thereof, a Civil Service Commission, and such other employees as may be needed;" and Sec. 9 expressly provides the Director "shall be the head of the department of personnel, responsible for the conduct of all its affairs," except as powers are vested in the Commission. And still further, Sec. 9(b) declares it shall be his duty (italics ours) "to appoint all *employees* of the department of personnel except the Director and the members of the Commission, and to *direct* and *control* their work and, . . . the expenditures from appropriations for the department." In the Bode case the Director appointed his subordinates *with the approval* of the Conservation Commission. In both cases the Commissioners fix the salaries of the Directors. It is clear from the foregoing, I think, that the Director of Personnel has far more power and independence than did the Director of Conservation in the Bode case. He is the chief administrative officer of the Department of Personnel except, as provided in Sec. 9, where powers are vested in the Civil Service Commission. What are those powers?

The duties of the Civil Service Commissioners are mainly quasi-legislative or judicial. Under Secs. 3(v) and 7(a) they make rules and recommendations to the Mayor for ordinances; and also make *recommendations* to the Director. [In the Bode case the Commission could make regulations which superseded state statutes. Marsh v. Bartlett, 343 Mo. 526, 121 S. W. (2d) 737.] In default of such rules the Director may nevertheless act, and he makes administrative regulations. The Commissioners conduct investigations under Sec. 7(c) touching the administration of the Article. Pursuant to Sec. 7(d) they finally determine (subject to legal action) questions referred to them by the Director, or on appeal by any appointing authority, em-

ployee or taxpayer, from any act of the Director or of any appointing authority. Sec. 7(e) requires them to hold examinations for the position of Director. Then, the final paragraph of Sec. 7 provides that beyond this "the Commission shall have no administrative powers or duties;" and "shall have no power to direct or control any employee of the department of personnel or other employee of the City, or the action to be taken by any of them in any matter or case."

In two places the Article refers to the whole personnel of the Department as "employees." Thus, Sec. 5 says the Department (italics below ours): "shall consist of a director of personnel as head thereof, a Civil Service Commission, and such *other* employees as may be needed." Again, Sec. 9(b) authorizes the Director "to appoint all *employees* of the department of personnel *except* the Director and the members of the Commission." But the Commissioners concededly are officers and both sections refer to them in the same way. And Sec. 9(q) provides the Director "may be removed *from office* only upon charges of nonfeasance . . . *in office.*" We do not regard these expressions as persuasive either way. It would not be controlling even if the Article did call the Director an employee, as witness the Lexington case, supra, 250 Ky. l. c. 98, 61 S. W. (2d) l. c. 1092, where the statute expressly declared a city manager was not an officer but the court held otherwise. The question is one of law on *all* the facts.

The Article provides some checks and balances between the Director of Personnel, the Commissioners and other municipal officers. But that does not make him any the less a public officer. Our whole government, federal and state, is founded on the basis of a separation of executive, ██ legislative and judicial powers. The fact that the Civil Service Commission make "rules" which govern the Director in the administration of the Department does not mean that they control his specific actions. A rule "is a definite regulation prescribed as a law of conduct," 37 Words and Phrases (Perm. Ed.), p. 818; or a "prescribed guide for conduct or action," Webster's New International Dictionary. It implies something of permanence and fixity *in general* as to all factual situations coming within it. The power to make rules is the antithesis of roving discretionary control over specific action. [Merchant's Exchange v. Knott, 212 Mo. 616, 640, 111 S. W. 565, 571.] And unless the Civil Service Commission have the discretionary power to control the Director's specific activities he is not their employee. [14 Words and Phrases (Perm. Ed.), pp. 377, 431; Vaseleou v. St. L. Realty & Securities Co., 344 Mo. 1121, 1126(2), 130 S. W. (2d) 538, 539(3).]

Neither does the fact that the Commission exercise quasi-judicial power in determining questions referred to them by the Director or on *appeal* by other parties from any action of the Director, make him any the less an officer. Even a court cannot control the exercise of lawful discretionary powers. If there is no limitation on the power

of the Commission the whole purpose of the Article could be thwarted and the city government thrown into politics if the power falls into bad hands. With every disposition to interpret liberally the new Article XVIII of the St. Louis Charter, we feel the law must be consistent, and cannot go as a matter of grace merely because the objective is worthy in present hands.

Now recurring to the specific issue whether the Civil Service Commission has the right to pay the traveling and maintenance expenses of nonresident applicants for the position of Director of Personnel, on trips to St. Louis for conferences and scrutiny looking to their later examination and certification to the Mayor as eligibles. This issue was probably raised to determine the constitutional eligibility of nonresidents, on the assumption that the position could be filled by September 15, 1942, as contemplated by Sec. 30 of the Article. We have ruled that no person now a nonresident of the State can assume the duties of the office for at least a year. Whether it would be a legitimate outlay to pay the expenses of such conferences held a year before the applicant could be inducted into office, or how long in advance they may be held, are questions not presented by this record. It might depend on the particular facts. There may or may not be acceptable resident applicants who are now eligible, or who will be within a reasonable time. If there are none it will be the duty of the Commissioners to hold an examination later under Sec. 7(e) of the Article. We leave the specific question unanswered.

But in this connection we will say the present ineligibility of nonresidents for the position of Director cannot operate as a deterrent delaying or preventing the employment and payment of experts to assist in formulating fitness tests for Director and rating the results, as sanctioned in part 1 of this opinion. The same is true of the employment and payment of the administrative service advisory organization as approved in point 2 of this opinion.

■ The last question presented is as follows. Sec. 4(d) of the new Article XVIII requires the Mayor and Aldermen to provide, by ordinance (italics hereafter ours): ''for appropriations for the purposes of the department of personnel, *adequate* to provide for the effective administration and enforcement of the provisions of this Article and the rules and ordinances adopted thereunder. In each fiscal year, such appropriations shall aggregate *not less than* one-half of one percent of the amount of all expenditures for personal services in the City service in the fiscal year next preceding, and *in default of* such minimum appropriations or any part thereof, such minimum appropriations or any deficiency therein, *nevertheless shall be deemed to have been made.*''

On the other hand, Sec. 7, Art. XVI of the original Charter provides: ''All *unexpended* appropriated money, *not appropriated by special ordinance for a specific purpose,* shall at the end of the current fiscal year revert back to the fund or funds from which the appro-

priation was made." And Sec. 6 of the same Article XVI provides: "whenever an appropriation *exceeds* the amount *required* for the purpose for which it has been made, the excess or any portion or portions thereof may by ordinance recommended by the board of estimate and apportionment be appropriated to any other purpose or purposes."

The plaintiff Commissioners contended below, and do here, that by virtue of Sec. ▇ 4 (d), supra, they are assured annual recourse to and disposition of appropriated funds in the minimum amount of ½% of the service payroll of the City for the preceding fiscal year; that they can definitely count on that much money; that their work is continuous and requires them to enter into obligations which are executory or long range, entailing financial commitments on a per diem, percentage or other indefinite basis (as for traveling and maintenance expenses). On that theory they aver the provision of Sec 7, Art. XVI requiring unexpended appropriated money to revert to its source at the end of the fiscal year, does not apply to. a *minimum* appropriation for the Department of Personnel, in view of the fact that said Sec. 4(d) is the later enactment adopted as part of an amendment to the charter. And they assert the right to retain any part of a minimum appropriation received and not in fact expended during a fiscal year, without prejudice to their right to receive the full minimum during the next and succeeding years.

The defendant comptroller in his answer pleaded that under said Sec. 7 appropriated money "not- expended *or definitely obligated* before the end of the fiscal year" will revert. He may have meant by the phrase which we have italicized that the money must have been appropriated by special ordinance for a specific purpose, this being the language of the section. At any rate, in his brief he maintains that the section applies literally to minimum appropriations for the Department of Personnel; and that *all* appropriated funds not *in fact* expended during a fiscal year will revert at the end of that year unless appropriated by a special ordinance for a special purpose. In other words, to escape reversion the money must have been actually disbursed, or there must have been a legislative allocation thereof for a particular purpose by the Board. of Aldermen through a special ordinance, and not a mere administrative allocation by the Department after the appropriation is received.

The trial court held that under Sec. 4(d), supra, the Civil Service Commission have complete and independent discretionary power to determine the "nature, necessity and amounts of expenditures" from the Department's appropriations, within their Charter powers liberally construed; but further held in harmony with the Comptoller's contentions, that "any balance left unexpended out of the appropriations . . . at the close of each fiscal year (will) revert and lapse back into the City treasury, at the expiration of such fiscal year, as provided by" Sec. 7, Art. XVI. The Commissioners have appealed.

The word "unexpended" has been given a broader meaning than "undisbursed" in two cases: Norman v. Central Ky. Lunatic Asylum, 92 Ky. 10, 17 S. W. 150, and People ex rel. Brinkerhoff v. Swigert, 107 Ill. 494, 499. In the former, where the Board of Commissioners of a state asylum by resolution had set aside or allocated part of a fund for building repairs, it was held to be "disposed of," and no longer a part of the "unexpended balance" in the fund within the meaning of a statute. In the Illinois case, where a statute provided "any unexpended balance" in a state fund should be transferred by the State Auditor, the court ruled this did not include every part of the fund which had not been actually disbursed, regardless of existing well founded claims thereagainst.

In view of the fact that Sec. 7, Art. XVI in the instant case applies to all the departments of the city government of St. Louis; and that the word "unexpended," as used therein, is qualified by the rather definite phrase (italics ours), "not appropriated by *special ordinance for a specific purpose*;" we are not holding that unexpended appropriations for *all* these departments can be protected from reversion by *departmental* action or allocation, as held in the Norman case, supra. Indeed, that question is not presented for decision. But we do think this can be done by the Department of Personnel. Sec. 4(d) specifically declares the appropriations for that department shall be adequate; fixes a minimum; and provides that minimum shall be deemed appropriated whether in fact appropriated or not. This certainly evidences a clear intent that the Department can count on that much money and commit itself accordingly, although some part of the money may not have been actually paid out by the end of the fiscal year. And, of course, if it has been appropriated by special ordinance for a specific purpose it will not revert.

On the other hand, we are unable to agree with the Commissioners' contention that no part of such minimum appropriations for a fiscal year will revert, regardless of whether it has been allocated for a legitimate project or use chargeable to that year. If not needed, then it *exceeds* the amount *required* within the meaning of ██ Sec. 6, Art. XVI and may be reappropriated as provided therein. Otherwise it will revert to the City treasury. The judgment of the trial court does not show what meaning was attached to the word "expended," when it declared "any balance left unexpended . . . at the close of each fiscal year" will revert to the city treasury. So we are unable to determine whether the judgment is in conflict with the conclusion we have reached. But to clarify the judgment on this point, and for error in the judgment under our point 3, in holding that nonresidents are eligible for appointment to the position of Director of Personnel, the cause is reversed and remanded for further proceedings in harmony with this opinion.

Reversed and remanded. *Clark, Tipton* and *Leedy, JJ.,* concur; *Douglas* and *Hays, JJ.,* concur in parts 1, 2 and 4, but dissent as to part 3 in separate opinion of *Douglas, J.; Gantt, J.,* not sitting.

DOUGLAS, J. (dissenting).—■ I concur in the principal opinion except as to the conclusion that the director of personnel is an "officer" in the constitutional sense. With that holding I respectfully disagree and dissent. In my opinion, the director is not an officer and therefore is not subject to the restriction of Sec. 10, Art. VIII of the Constitution requiring one year's residence in this State before appointment.

The great number and variety of decisions on who is or who is not an officer of government constitute a vast wilderness. A trend is apparent, however, away from the strict construction announced in State ex rel. v. Valle, 41 Mo. 29, wherein the rule seems to have been extended to those exercising public employment as distinguished from "mere employment as a contractor or agent under some public office." The reason for a more liberal view is doubtless because state governments and municipal corporations more particularly are now performing many of the functions formerly performed by private corporations, and in which the restrictions applicable to public officers exercising governmental functions are neither necessary nor pertinent. Likewise, methods of business corporations are being more widely used in the administration of state and municipal affairs.

State ex inf. McKittrick v. Bode, 342 Mo. 162, 113 S. W. (2d) 805, said: "It is not possible to define the words 'public office or public officer.' The cases are determined from the particular facts, including a consideration of the intention and subject matter of the enactment of the statute or the adoption of the constitutional provision. In other words, the duties to be performed, the method of performance, end to be attained, depository of the power granted, and the surrounding circumstances must be considered."

Turning now to the particular facts of this case we find that the new Article XVIII of the St. Louis Charter is intended to provide a classified civil service on merit and fitness, free from political and other considerations. This calls for certain checks and balances which lead to much detail and complexity. The article creates a civil service commission of three members to be appointed by the mayor. These must be citizens of the United States and residents of St. Louis for at least two years. They are not required to be experienced in personnel administration. Their only qualification to that end is that their past records indicate they favor the merit system.

The article then provides for a director of personnel and makes certain safeguards to insure freedom from political considerations in his appointment. The commission does not appoint the director but very actively participates in his appointment. It conducts competi-

tive tests for this position and certifies a list of eligibles to the mayor who appoints from the top three. Nor can the commission discharge the director but it must conduct the hearing on his discharge and make recommendations to the mayor who has the final decision. I do not believe that these conditions, imposed to prevent partisanship, operate to make the director an officer rather than an employee.

The general scheme of administration of the many phases of this merit system indicates that the director, while occupying a position of responsibility, acts in a capacity subordinate to the commission.

For instance, the article requires that civil service rules be adopted by the commission to give effect to the purpose of the article. Sec. 3 (v) provides: "(v) for the ▇▇▇ administration and enforcement of the provisions of this Article and all provisions of ordinances and rules adopted in pursuance thereof, by the Director, subject to the rules of the Commission and subject to appeal to and review on appeal by the Commission."

Thus, the administration by the director is subject and pursuant to the rules adopted by the commission. And of great weight in determining the question before us, is the provision that any action of the director is subject to appeal and review by the commission. His actions, therefore, are not only governed by the rules enacted by the commission but even his decisions are subject to review by the commission.

This is even more clearly brought out in Section 7, entitled: "Powers and Duties of the Commission." Section 7 (a) provides: "(a) to prescribe, and to amend from time to time as such action is deemed to be desirable, rules for the administration and enforcement of the provisions of this Article, and of any ordinance adopted in pursuance thereof, and not inconsistent therewith;"

Then Section 7 (d) provides: "(d) to consider and determine any matter involved in the administration and enforcement of this Article and the rules and ordinances adopted in accordance therewith that may be referred to it for decision by the director, or on appeal by any appointing authority, employe, or taxpayer of the City from any act of the Director or of any appointing authority. The decision of the Commission in all such matters shall be final, subject, however, to any right of action under any law of the State or of the United States;"

The article also specifies that the director is expressly subject to the command of the commission for the purpose of conducting special investigations and for making special reports.

There is a provision requiring the commission to perform the same duties with reference to the director as the director performs with reference to the positions in the classified service. There is a provision directing the commission to fix the salary of the director. These may be regarded as a legislative intention to place the position of director

in the "classified service." We will discuss the effect of this intention later but we now point out that this intention must account for the director's indefinite term of employment as all those in the classified service have the same indefinite terms in accordance with the policy of the article putting tenure on a merit basis alone.

Now turning to the duties the law places on the director, even though he is made the head of the department of personnel and appoints its employees, still I find he does not exercise his duties with the independence that characterizes a public officer.

For instance, the plans for classification and compensation which he must prepare must be submitted to and accepted by the commission before they become official. Section 9 (d) provides: "(d) to prepare and recommend, for action by the Commission, rules, including a classification plan and a service rating plan, drafts of ordinances for recommendation to the Mayor and Aldermen in matters requiring such ordinances, including a compensation plan, and changes as deemed desirable from time to time in such rules, and ordinances;"

To the same effect is Section 9 (k): "(k) to devise and recommend to the Commission a compensation plan consisting of scales of pay for the several grades or classes in due relation to each other and to rates prevailing for like employment in private industry, rules for the interpretation and application of the plan, and changes in such plan and rules from time to time as deemed desirable;"

The limitations of his authority are obvious because even his recommendations must be approved by the commission.

Section 9 (m) provides: "(m) to make annual reports to the Commission for its approval and transmission to the Mayor and Aldermen on the work of the department and the administration and effect of this Article, with such recommendations for action as he may deem desirable, and such special reports as may be requested by the Commission for the Mayor. Such reports shall be public records;"

I mentioned above the legislative intention of including the director in the classified service. This would seem to exclude any intention that he was to be an officer in the constitutional sense. Moreover, the amendment provides that the department of personnel shall consist of the director, the commission and such *other* employees as may needed. There can be no doubt but that the members of the commission are officers so that the use of "other employees" indicates that the director must also be regarded as an employee. While such legislative declarations are not controlling ██ we have long held in this State they are entitled some significance. [State ex rel. Pickett v. Truman, 333 Mo. 1018, l. c. 1021, 64 S. W. (2d) 105, and cases cited.]

State ex inf. McKittrick v. Bode, supra, held that the director of conservation was not subject to the constitutional requirement as to residence. The majority opinion, in which I participated, found that the director was a public officer. Such finding was unnecessary to the

decision because that opinion turned on the theory since the conservation commission and the director were created by a constitutional amendment adopted subsequently to Sec. 10, Art. VIII, its provisions overrode the restrictions of the earlier section. Therefore, the conservation commission was not bound by Sec. 10, Art. VIII in carrying out its authorized powers of determining the qualifications of its director. The minority opinion in that case proceeded on the theory that the director was not a public officer and is, I believe, most pertinent here, despite the differences mentioned in the principal opinion.

Coming back to the principal opinion in this case it points out that certain positions such as the presidents of state institutions of higher learning, chief engineer of the State Highway Commission and the health supervisor of State eleemosynary institutions must be filled by *experts*; and to get them it is sometimes necessary to go outside the State. "The law should not be too restrictive in such matters," it declares. This is strikingly apposite here, because a person to be eligible for appointment as director of personnel "shall have had not less than 5 years' experience in personnel administration of which not less than two years shall have been in public personnel administration." This calls for qualifications which are to be found in a limited and restricted field.

An analogous situation involving the question whether the State librarian was an officer in the constitutional sense arose in Ohio. [State ex rel. Newman v. Skinner, 128 Ohio St. 325, 191 N. E. 127, 93 A. L. A. 331.] The court found that such a position was not an office. It is true that the State Library Board had the power to appoint and remove the librarian, but otherwise the facts are somewhat similar. The Court said: "Its members (State Library Board) are appointed by the Governor. It is authorized and directed to make rules for the government of the state library and the organization of a library service of the state departments. . . . The librarian acts not independently, but under the direction and supervision of the State Library Board and subject to the rules and regulations established by it. The statute does not fix any term, or require an oath or the giving of a bond; nor is the salary or compensation fixed by law. . . ."

In conclusion, I adopt the closing argument of the commission: "In State ex rel. Landis v. Board of Commissioners of Butler County, 95 Ohio State, 157, 115 N. E. 919, l. c. 920, the Court says: 'to constitute a public office, . . . it is essential that certain independent public duties, a part of the sovereignty of the state, should be appointed to it by law.'

"Further explaining, the Court says: 'If specific statutory and independent duties are imposed upon an appointee in relation to the exercise of the police powers of the state, if the appointee is invested

with independent power in the disposition of public property, or with power to incur financial obligations upon the part of the county or state, if he is empowered to act in those multitudinous cases involving business or political dealings between individuals and the public, wherein the latter must necessarily act through an official agency, then such functions are a part of the sovereignty of the state.'

"The foregoing language was approved and applied by this court in the case of State ex rel. Pickett v. Truman, 333 Mo. 1018, 64 S. W. (2d) 105, l. c. 106.

"If we apply the test so laid down to the Director of Personnel, it may well be doubted whether he independently is vested with, or wields, any part of the sovereign power of the state. His position is more analogous to that of a chief clerk, whose action is subject to reversal by the Commissioners, upon any appeal taken [Section 7 (d)]. No bond and no oath of office seem to be required."

Therefore, I am of the opinion that the finding of the court below that the commission was authorized to certify for appointment as director of personnel the names of non-residents of Missouri and that such non-residents would not be disbarred from appointment for that reason should be affirmed. *Hays, J.,* concurs.