**Donald G. BLACKWELL, Plaintiff/Appellant,**

v.

**CITY OF ST. LOUIS and William Duffe, Defendants/Respondents.**

**No. 55600.**

Missouri Court of Appeals, Eastern District, Division Four.

Aug. 15, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 13, 1989.

Application to Transfer Denied Nov. 14, 1989.

Jerome A. Diekemper, Clayton, for plaintiff/appellant.

Julian Bush, St. Louis, for defendants/respondents.

SATZ, Judge.

This case comes before this Court for the second time. The facts, in more detail, may be found in the Court's first opinion. *Blackwell v. City of St. Louis*, 726 S.W.2d 760 (Mo.App.1987).

In the present case, plaintiff, Donald Blackwell, a fire fighter employed by the defendant City of St. Louis (City), appeals from a denial of his motion for partial summary judgment and from a grant of summary judgment against him and in favor of the defendant City and defendant William Duffe (Duffe), the City's Director of Personnel. We affirm the trial court's judgment.

In support of his appeal, plaintiff has filed a legal file of 248 pages. Neither plaintiff nor defendants, however, have expressly designated the specific evidence submitted to the trial court in the summary judgment proceeding in that court. Plaintiff, apparently, did "support ... [his] motion" for summary judgment in the trial court by "refer[ing] the Court to his brief ..., the pleadings ..., and the Court's file on this matter." Defendants made no designation at all in support of their motion. It is not our function to sift through the material now furnished us to determine what evidence the trial court used to reach its judgment.

The less precise the record is, the greater the difficulty in properly resolving the issues. In a number of prior opinions, this Court has outlined the proper method for designating the record for summary judgment in the trial court and, in turn, on appeal. E.g. *Johnson v. Johnson*, 764 S.W.2d 711, 713 (Mo.App.1989). Having said this, we take the present record as we find it.

At the time of the incidents in question, plaintiff was a veteran fire fighter who held the position of Battalion Chief in the City's Fire Department and also served as president of Local 73 of the St. Louis Fire Fighters, AFL–CIO. In his capacity as union president, plaintiff attended an October 1984 meeting of the City's Board of Alder-

men at which a proposal to increase the fire fighters' pension was defeated, when an attempt to override the Mayor's veto failed.

Following the vote on the proposal, plaintiff was approached by members of the news media, who interviewed him for his reaction. Subsequently, two newspaper articles about the meeting included comments, purportedly made by plaintiff, regarding Alderman James Shrewsbury, an opponent of the pension proposal. An article in the St. Louis Post–Dispatch quoted plaintiff as saying, "I'm sure the Fire Fighters will be acting in preventing his [Shrewsbury's] election." Several days later, an article in the South Side Journal quoted plaintiff as saying the Union would "be active in preventing his [Shrewsbury's] re-election."

According to the briefs, the City's Director of Public Safety, Thomas Nash (Nash), filed charges against plaintiff. Plaintiff was subpoenaed to appear before and was questioned by defendant Duffe, the City's Director of Personnel, as part of an investigation by Duffe. Plaintiff was represented by counsel. Subsequently, plaintiff appeared at a hearing before the City's Civil Service Commission (Commission). Again, plaintiff was represented by counsel. The Commission rendered its decision based upon written Findings of Fact and Conclusions of Law.

The Commission found as "fact" that: plaintiff did state to the press "that St. Louis Fire Fighters would work to prevent the re-election of Alderman James Shrewsbury"; this "statement constituted a threat of active political participation by the Fire Fighters during Alderman Shrewsbury's re-election campaign;" plaintiff "was in a position, by virtue of his office, to influence or coerce subordinate Fire Fighters to further political acts"; and these "threats could be construed as a warning to other public officials of possible political retribu-

tion by Fire Fighters should [these] officials take a position contrary to the desires of the Fire Fighters." The Commission concluded that plaintiff's "public threat against ... Shrewsbury" is "conduct and speech by a Battalion Chief" prohibited by § 19, Article XVIII of the City's Charter and Rule XV, § 3(b) of the Commission's Civil Service Rules, each of which provides:

> No person holding a position in the classified service shall use his official authority or influence to coerce the political action of any person or body, or to interfere with any election, or shall take an active part in a political campaign.... But nothing in this section shall be construed to prohibit or prevent any such person ... from expressing privately his opinions on all political questions....

The Commission ordered that plaintiff be suspended without pay for 28 days.

Plaintiff then filed a four-count petition in the circuit court joining, as defendants, the City, Duffe, Nash and the individual members of the Commission. In Count I of his petition, plaintiff sought review of the Commission's decision pursuant to our Administrative Procedure Act (APA), Chap. 536 RSMo 1978. By agreement, this Count was submitted separately to the circuit court. The court reversed the Commission's order, concluding "the findings and decision of said Commission are unsupported by competent and substantial evidence upon the whole record." On appeal, this Court affirmed, holding there was no substantial evidence that plaintiff actually coerced others or actively engaged in political activity. *Blackwell, supra,* at 763. According to defendants' brief, plaintiff was awarded back pay as a result of prevailing on Count I.

Plaintiff continued to prosecute his § 1983 action, Count III, against defendants Duffe and the City.[1] In this action, plaintiff alleges the Commission and Duffe,

---

**1.** 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state ... subjects, or causes to be subjected, any citizen of the United States or other person with the jurisdiction thereof to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

under color of law and pursuant to official policy, "intentionally" took actions against plaintiff "in retaliation against Plaintiff" for exercising his First Amendment rights, and those actions "deprived Plaintiff of his right to freedom of speech on matters of public concern...." More generally, plaintiff alleges the Commission and Duffe "in promulgating, maintaining and enforcing [the Charter and Commission Rules] against Plaintiff and other classified employees, and in suspending Plaintiff for 28 days ... are intentionally violating, interfering with, and chilling the exercise of the [First Amendment] rights of Plaintiff and other classified employees...." In their joint answer, the City and Duffe denied these allegations and alleged several affirmative defenses: election of remedies, estoppel, and, as to Duffe, official (qualified) immunity.

Defendants then filed a joint motion for summary judgment, and plaintiff filed a motion for a partial summary judgment against the City on the issue of liability. The circuit court granted defendants' motion and, having done so, found plaintiff's motion to be moot. Plaintiff's appeal followed.

Defendants raise several procedural issues, each of which, they argue, must be resolved in their favor, making a decision on the merits of plaintiff's appeal unnecessary. We dispose of those issues first.

■ Relying on *James v. City of Jennings*, 735 S.W.2d 188, 190 (Mo.App.1987), defendants contend the trial court lacked jurisdiction to hear plaintiff's § 1983 claim, plaintiff's Count III, because, at the time plaintiff filed this claim, he had not exhausted his administrative remedy, plaintiff's Count I. This lack of jurisdiction was not cured by plaintiff's subsequent exhaustion of his administrative remedy, defendants contend, because a court's jurisdiction depends on facts existing at the time its jurisdiction is invoked. Since this Court's appellate jurisdiction is derived from the trial court's jurisdiction, defendants reason, this Court has no jurisdiction to act because the trial court had no jurisdiction to act.

Defendants' reliance on *James* is misplaced. In *James*, this Court held there was no jurisdiction to entertain a § 1983 action for damages brought by plaintiffs, who had decided to forego judicial review, under Chapter 536 RSMo 1986, of an administrative decision denying an occupancy permit. *Id.* The Court refused to allow a collateral attack that would "by-pass the judicial review procedures" provided by Chap. 536, our Administrative Procedure Act (APA). *Id.* In the present case, by contrast, plaintiff did not attempt to by-pass the APA. The APA is the basis of his Count I. He was pursuing his administrative and § 1983 remedies simultaneously and, by agreement, fully pursued his administrative remedy, obtaining a reversal of the Commission's decision, before proceeding with his § 1983 action, Count III.

■ More important, for defendants to prevail on this argument, we would be required to hold that administrative review must be pursued to final judgment before a § 1983 action may even be filed in our courts. That holding would be contrary to the teaching of *Felder v. Casey*, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988). In *Felder*, the Supreme Court held a state notice-of-claim statute conflicted with the remedial objectives of § 1983 and was preempted pursuant to the Supremacy Clause when a § 1983 action was filed in state court. Although states have the authority to prescribe rules and procedures that govern suits in their courts, "that authority does not extend so far as to permit States to place conditions on the vindication of a federal right." 108 S.Ct. at 2311. Defendants' argument is, thus, not persuasive.

Defendants raise three other procedural issues, election of remedies, double recovery and collateral estoppel, none of which has merit. We do not address these in detail, however, because plaintiff does not prevail on the merits.

■ The basic issue here is whether § 1983 liability may be imposed upon the City based on the Commission's incorrect

decision to suspend plaintiff. Our answer is no.

Municipal liability under § 1983 has had an uncertain history. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also, Williams v. Butler*, 863 F.2d 1398 (8th Cir.1988).[2] This history may be a specific reflection of general differences of opinion "over the scope of citizens' ability to recover for violation of their constitutional rights by governments and their officials." Williams, *The Constitutional Vulnerability of American Local Government*, 1986 Wisc.L.R. 83, 128.

In *Monell v. Department of Social Services, supra*, the Department of Social Services and Board of Election of the City of New York had an official policy compelling pregnant employees to take unpaid leaves of absence before those leaves were required for medical reasons. 98 S.Ct. at 2020. This policy constituted a constitutional tort. The Court held the City of New York and other municipalities were "persons" under § 1983 and, thus, could be sued directly under that statute where the action alleged to be unconstitutional "implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." 98 S.Ct. at 2036. In addition, the Court pointed out that § 1983 also authorizes suits "for constitutional deprivation visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Id.* 98 S.Ct. at 2036.

The Court rejected the use of the doctrine of *respondeat superior*, concluding that municipalities could be held liable only when an injury was inflicted by a government's "lawmakers or by those who edicts or acts may fairly be said to represent official policy." *Id.* 98 S.Ct. at 2037–38. The Court, however, made no attempt to define "official policy" and left the "full contours" of municipal liability under § 1983 to be developed further on "another day." 98 S.Ct. at 2038.

Subsequently, in *Pembaur v. City of Cincinnati, supra*, the court considered whether a single decision of a municipal official could subject the municipality to liability under § 1983. County deputy sheriffs were instructed by the county prosecutor to forcibly enter a doctor's office to serve capias warrants in violation of the doctor's Fourth Amendment rights. By acting as "final decision maker for the County", the prosecutor made the county susceptible to § 1983 liability by a single decision. 106 S.Ct. at 1301.

The majority expressed three separate views on the ultimate theory of municipal liability. Justice Brennan, in his plurality opinion, stated that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." 106 S.Ct. at 1298. He explained:

[A] government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decision makers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.

*Id.* 106 S.Ct. at 1299.

As examples of a City being held liable under § 1983 for a single decision by a policy making body, he cited *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), in which the City Council passed a resolution firing the

---

**2.** The decisions in the *Williams* case by the 8th Circuit Court of Appeals were vacated and remanded twice by the Supreme Court. The Supreme Court remanded the first decision for reconsideration in light of *Pembaur, supra*. Then, the Circuit Court's decision on remand was vacated for further re-consideration in light of *Praprotnik, supra*.

plaintiff without a pretermination hearing, and *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), in which the City Council cancelled a license permitting a concert because of a dispute over the content of the performance. *Id.* 106 S.Ct. at 1298. "Even a single decision" by a City's properly constituted legislative body may trigger § 1983 liability, he stated, "because even a single decision by such a body unquestionably constitutes an act of official government policy." *Id.* 106 S.Ct. at 1298.

However, municipalities, like other government entities, often spread policy-making authority among various officials. A municipality is liable under § 1983 only for a decision made by the official responsible for establishing the final governmental policy, *Id.* 106 S.Ct. at 1299, and whether an official has policymaking authority is a question of state law. *Id.* 106 S.Ct. at 1300. Thus,

> [M]unicipality liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.
>
> *Id.* 106 S.Ct. at 1300.

The Court addressed the issue again in *City of St. Louis v. Praprotnik, supra.* In that case, the plaintiff, an employee of the City of St. Louis, sued the City under § 1983 alleging that his First Amendment rights had been violated by the City when the City transferred and later laid him off in response to his appeal of an earlier suspension.

Justice O'Connor, in a plurality opinion, did not completely endorse the plurality opinion and the teaching of *Pembaur.* Reviewing the relevant cases, she stated that in *Owen* and *Fact Concerts*, "[w]e ... *assumed ...* an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Id.* 108 S.Ct. at 923. (Emphasis Added) In *Pembaur*, she stated, the Court undertook to define

more precisely when a single decision may be enough to establish an unconstitutional municipal policy. The Court, she noted, "was unable to settle on a general formulation" in that case. Nonetheless, she distilled "several guideline principles" from Justice Brennan's plurality opinion in *Pembaur.* These principles were:

1. [M]unicipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered".

2. [O]nly those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability.

3. [W]hether a particular official has "final policymaking authority" is a question of *state law.*

4. [T]he challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business. (Emphasis Theirs)

*Id.* 108 S.Ct. at 942.

To us, these guidelines narrow Justice Brennan's plurality opinion in *Pembaur.* In *Pembaur*, Justice Brennan stated a single, isolated decision taken by the municipality's final policymaker in the area in question is, *ipso facto*, the policy of the municipality; and, therefore, that single decision makes the municipality susceptible to § 1983 liability. Not so under the guidelines distilled by Justice O'Connor in *Praprotnik.* Under those guidelines, "the challenged action must have been taken pursuant to a policy adopted" by the final policymaker in order to subject the municipality to § 1983 liability. Thus, there must be an established policy before a challenged action creates § 1983 liability.

This interpretation squares with Justice O'Connor's limited concurrence in *Pembaur.* In that case, she stated:

> As the City of Cincinnati freely conceded, forcible entry of third-party to effect an arrest was standard operating procedure [at the time of the break in]. Given this

procedure was consistent with federal, state and local law at the time the case arose, *it seems fair to infer that respondent county's policy was no different.* (Emphasis Added) 106 S.Ct. at 1304.

Justice Brennan's understanding of Justice O'Connor's guidelines, apparently, is the same as ours. In concurring only in the result reached in *Praprotnik*, he took vigorous exception to her reading his plurality opinion in *Pembaur* as requiring the challenged action to be part of an already established policy. Thus, he stated:

In [*Owen* and *Fact Concerts*] we neither required nor, as the plurality suggests, assumed that these decisions reflected generally applicable "policies" as that term is commonly understood, because it was perfectly obvious that the actions of the municipalities' policymaking organs, whether isolated or not, were properly charged to the municipalities themselves.

. . . .

[J]ust as in *Owen* and *Fact Concerts* we deemed it fair to hold municipalities liable for the isolated, unconstitutional acts of their legislative bodies, regardless of whether those acts were meant to establish applicable "policies", so too in *Pembaur* four of us concluded that it is equally appropriate to hold municipalities accountable for the isolated constitutional injury inflicted by an executive final municipal policymaker, even though the decision giving rise to the injury is not intended to govern future situations.

*Id.* 108 S.Ct. at 932.

Where the Court will go from *Praprotnik* we do not know. However, to us, the concept of municipality liability under § 1983 expressed in Justice O'Connor's plurality opinion in *Praprotnik* makes more sense than the concept expressed in Justice Brennan's plurality opinion in *Pembaur.*

Plaintiff reads the Supreme Court decisions differently than we do. He apparently finds no difference in the views expressed in those opinions. To him, there is a single view: the one expressed by Justice Brennan. Thus, plaintiff premises his argument on that view and the principle created by it.

Plaintiff contends the Commission is the City's final policymaker for hiring, firing and disciplining City employees. The Commission's decision to discipline him, plaintiff argues, involved a "deliberate choice", made from alternative courses of action; for example, plaintiff suggests the Commission could have chosen not to discipline him. This single decision, made by the City's final policymaker in the area in question, violated his First Amendment rights, plaintiff reasons and, thus, subjects the City to liability under § 1983.

Arguably, the Commission is the City's final policymaker concerning prohibition of political activity by City employees. The Commission is authorized to make employment policy on behalf of the City. City Charter, Art. XVIII, § 7A. More specifically, it is given authority to make and enforce personnel rules, propose ordinances and conduct investigations of personnel. These multiple functions give the Commission flexibility to make choices and take various courses of action concerning personnel. Moreover, in *dicta* in *Praprotnik, supra,* a plurality of the Court analyzed the City's Charter and specifically determined the City's personnel policy is made either by the mayor and aldermen or by the Commission. 108 S.Ct. at 926–27. For our purposes here, we assume the Commission was the final policymaker concerning the political activity of City employees.

Having authority to make final policy, however, does not make the Commission's single decision here the final policy in the area in question. The Commission's duties are "mainly quasi-legislative or judicial." *Kirby v. Nolte,* 349 Mo. 1015, 164 S.W.2d 1 (1942). The Commission's adoption of its Rule XV, § 3(b) was the Commission acting in its rule making, quasi-legislative and, thus, policymaking capacity. Sensibly read, this Rule is the City's final policy concerning political activity of City employees.

To properly carry out its Rule and, at the same time, to assure employees of due process, the Commission apparently established a procedure to guard against the Rule being ignored or cavalierly violated. For example, Duffe's questioning of plaintiff appears to be a proper pretermination hearing. No decision was made by Duffe, nor could it be made until plaintiff was given a procedurally acceptable hearing before the Commission. A hearing before the Commission was held and was procedurally correct. Plaintiff was represented by counsel before Duffe and before the Commission. Thus, plaintiff does not complain his hearings were procedurally defective.

Plaintiff's complaint rests on the decision reached by the Commission not the process used to reach it. But, to reach its decision, the Commission was acting in its quasi-judicial capacity. The Commission did not operate in a vacuum or start with a clean slate. There is nothing in the record to show the Commission was attempting to do anything more than apply the policy reflected in its Rules. For example, in its Findings of Fact and Conclusions of Law, the Commission makes specific reference to its application of the Charter provisions and its identical Rule.

Moreover, the record simply discloses the Commission incorrectly applied its Rule. There are no operative facts to show this was done by conscious misdirection, subterfuge or conspiracy to avoid the Rule. The Commission found, as fact, that plaintiff did make the statements quoted in the newspapers. These statements, the Commission inferred, constituted use of his official authority and influence "to coerce" the political activity of subordinate fire fighters, other public officials, and the Board of Aldermen. This Court disagreed with that reasoning. The Rule, the Court said, prohibits the use of official authority "to coerce the political action of any person or body...." *Blackwell v. City of St. Louis, supra,* 726 S.W.2d at 763. But, the Court found no evidence that plaintiff "actually coerced, intimidated or pressured anyone". *Id.* at 763, and it found no evidence to show plaintiff's "official capacity placed him in a position to actually coerce others by means of discharge, discipline, transfer or reassignment." *Id.* at 763. Whether this evaluation by the Court is a characterization of the Commission's findings and conclusions as an improper weighing of evidence, incorrect reasoning, a mistake of fact, a mistake of law or a mistake about a mixed question of fact of law, does not change the basic character of the Commission's action. It incorrectly applied the Rule it adopted. Nothing more, nothing less. Thus, "the challenged action" was not "taken pursuant to a policy adopted by the ... officials responsible ... for making final policy for" the City. *Praprotnik, supra* 108 S.Ct. at 924. There simply was no policy to prohibit plaintiff from making the statements he did.

We do not mean nor intend to imply that a decision reached, as it was here, through the exercise of the quasi-judicial function is necessarily exempt from § 1983 liability. We need not and do not address that issue here. We expressly noted the Commission's exercise of its quasi-judicial function simply as additional and significantly relevant evidence showing its decision was an attempt to apply an already established policy.

Moreover, we do not read the language of the Rule as a "precatory admonition" by the Commission to insulate itself and the City from liability based on acts inconsistent with that policy. See *Praprotnik, supra,* 108 S.Ct. at 927. This is not to say that the City could not be held liable for a series of similar actions by the Commission. Nothing precludes a plaintiff from using a series of similar decisions to show this practice is, in fact, the municipal policy although it is not authorized by the written Rule. *Id.* 108 S.Ct. at 927.

Finally, we must address a relevant issue not raised by parties. Our Courts consistently characterize a quasi-judicial decision not based on substantial evidence as an "arbitrary and capricious" decision. *E.g. Blackwell v. City of St. Louis, supra,* 726 S.W.2d at 763. Whatever that characterization means in other contexts, it is insufficient here to raise a prima facie showing

that the Commission intended to establish a different and unacceptable policy contrary to the policy established by its written Rule. Plaintiff had ample notice and opportunity to use discovery to establish operative facts supporting this inference. He failed to do so.

■ Plaintiff next contends Duffe was not entitled to qualified immunity, and, therefore, the trial court's grant of summary judgment on this ground was error. We disagree.

Government officials performing discretionary functions generally are shielded from "civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Whether an official is immune "generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken". *Id.* "Clearly established" means the right the official is alleged to have violated "must have been 'clearly established' in a ... particularized, ... sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* 107 S.Ct. at 3039. An official who "reasonably but mistakenly" concludes his conduct to be constitutionally permissible "should not be held personally liable." *Id.* In addition, this defense of "qualified immunity" should be resolved at the earliest stage in the process, and, therefore, it is an appropriate issue to be resolved by summary judgment. *E.g. Harlow v. Fitzgerald, supra,* 102 S.Ct. at 2737–2738.

In the present case, plaintiff alleges that Duffe, acting under color of state law and pursuant "to City policy," questioned plaintiff; this questioning was done "intentionally in retaliation against Plaintiff for the exercise of his" First Amendment rights and "deprived" plaintiff of those rights, causing him injury. The City's Charter, however, charged Duffe with the duty to make investigations concerning the enforcement of the Charter. Art. XVIII, § 9(j). More important, Duffe did not suspend plaintiff, the Commission did. Thus, the relevant question here is an objective question, albeit a fact—specific question: whether a reasonable Director of Personnel could have believed Duffe's questioning of plaintiff to be lawful, "in light of clearly established law and the information [Duffe] possessed." *Anderson, supra,* 107 S.Ct. at 3040.

To answer this question, plaintiff's conclusory allegations are not meaningful. *See, e.g. Wakup v. Brown,* 637 S.W.2d 335, 337 (Mo.App.1982). Moreover, plaintiff has cited no cases nor has our research disclosed any that hold or teach the questioning of a city employee by a city's personnel director violates the employee's First Amendment rights. A decision to dismiss the employee may be coercive and, thus, violate the employee's First Amendment rights. *See, Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). But, the mere posing of questions, as was done here, cannot reasonably be deemed coercion.

No one disputes the City may place reasonable restrictions on the political conduct of its employees. *E.g. Pollard v. Bd. of Police Comm'rs.,* 665 S.W.2d 333, 339 (Mo. banc 1984), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985). Whether plaintiff's "speech" here was protected by the First Amendment is determined by balancing his interests, "as a citizen, in commenting upon matters of public concern and the interests of the [City], as an employer, in promoting the efficiency of the public services it performs through its employees." *See, e.g., Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). But, where this balancing test is required, the employee's "right can rarely be considered 'clearly established' at least in the absence of closely corresponding factual and legal precedent." *Warner v. Graham,* 845 F.2d 179, 183 (8th Cir.1988). Understandably, then, on the present record, Duffe's con-

duct, objectively, was reasonable. "Qualified immunity would be meaningless if it could be defeated merely by the recitation of some well-recognized right and a conclusory allegation that the defendant infringed it." *Warner, supra* at 183.

Judgment affirmed.

SMITH, P.J., and STEPHAN, J., concur.